IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **DANIEL FIDOE**<br>c/o Speech Law, LLC<br>4403 Saint Clair Ave, Suite 400<br>Cleveland, OH 44103-1125<br><br>and<br><br>**OLIVIA BARTULOVIC**<br>c/o Speech Law, LLC<br>4403 Saint Clair Ave, Suite 400<br>Cleveland, OH 44103-1125<br><br>*Plaintiffs,*<br><br>v.<br><br>**CITY OF TWINSBURG**<br>10075 Ravenna Road<br>Twinsburg, OH 44087<br><br>and<br><br>**THOMAS MASON**<br>10075 Ravenna Road<br>Twinsburg, OH 44087<br><br>and<br><br>**BRIAN DONATO**<br>10075 Ravenna Road<br>Twinsburg, OH 44087<br><br>and<br><br>**SAM SCAFFIDE**<br>10075 Ravenna Road<br>Twinsburg, OH 44087<br><br>and<br><br>**WILLIAM D. EVANS, II**<br>1185 South Main Street<br>Akron, OH 44301<br><br>and<br><br>**POLY-TECH ASSOCIATES, INC.**<br>1185 South Main Street<br>Akron, OH 44301 | Case No.: 1:26-cv-1011 |

| *Defendants.* | |
| --- | --- |
| **COMPLAINT (JURY DEMAND ENDORSED HEREON)** | |

This is an action to vindicate Plaintiffs' rights to free speech and equal protection.

### PARTIES

1. Plaintiff Daniel Fidoe is a patrol officer for the City of Parma and a resident of Stark County.

2. Plaintiff Olivia Bartulovic is a patrol officer for the City of Alliance and a resident of Summit County.

3. Defendant City of Twinsburg is a political subdivision organized under Title 7 of the Ohio Revised Code.

4. Defendant Thomas Mason is the chief of police for the City of Twinsburg.

5. Defendant Brian Donato is a police lieutenant for the City of Twinsburg.

6. Defendant Sam Scaffide is the mayor of the City of Twinsburg.

7. Defendant Poly-Tech Associates, Inc., is a for-profit corporation based in Summit County.

8. Defendant William D. Evans II is the owner of Poly-Tech Associates.

### JURISDICTION & VENUE

9. This Court has original jurisdiction over the Complaint's federal claims under 28 U.S.C. §§ 1331, 1343, and 2201. The Court has supplemental jurisdiction over the Complaint's state-law claims under 28 U.S.C. § 1367.

10. This Court has personal jurisdiction over all Defendants, who reside in or conduct business in Ohio.

11. Venue is proper under 28 U.S.C. § 1391 because the events giving rise to these claims took place within this district.

### FACTS

**Corruption is a threat to public safety.**

12. Public corruption threatens public safety.

13. It undermines public confidence in the police, making it less likely that crimes will be reported, solved, and punished.

14. By undermining public confidence in the police, it emboldens criminals, who know they are less likely to be reported and more likely to be able to buy their way out of trouble.

15. In turn, it undermines judicial efficiency by clogging dockets with low-level offenses brought against those without the resources to influence the police, while higher-level offenses committed by better-financed, better-connected criminals go unpunished.

16. Corruption likewise diverts police resources, as officers deprioritize public safety and focus their attention on matters that benefit themselves or their commanding officers.

17. And it facilitates the advancement of unqualified officers, as corrupt leadership seek to insulate themselves from detection by bringing their allies into leadership and command roles.

**The Twinsburg Police Department is a hotbed of corruption.**

18. Despite the obvious and well-known risks, corruption has festered in the Twinsburg Police Department for years.

19. As soon as he entered training, Officer Fidoe was a witness to this corruption.

20. For instance, Lt. Brian Donato—who was then Officer Fidoe's field-training officer— would steal newspapers from the Cracker Barrel every morning when they went out for breakfast.

21. Lt. Donato encouraged Officer Fidoe to do the same, but Officer Fidoe refused.

22. Two years into his service at the department, Officer Fidoe was called to assist with a traffic stop on Liberty Road.

23. While searching the car, Officer Fidoe found an Aldi bag stuffed with $20,000 in cash in the front seat. Looking further, he opened the back hatch to discover boxes and boxes stuffed with even more cash. Fidoe would later discover he was searching a car owned by a Mexican drug cartel.

24. Fidoe and another officer brought the cash back to the station to be counted. The final total was over $1.2 million.

25. The officers sealed the cash in an evidence bag, secured it in an evidence locker, and left it in safekeeping to be deposited in the bank the next day.

26. The next morning, Officer Fidoe returned to the station to learn that detectives Jim Scarl and Mark Kreiger had removed the evidence from the locker and unsealed the bag—contrary to standard operating procedure—purportedly so they could take selfies with it before taking it to the bank.

27. But when the officers went to the bank, they only deposited $677,600—about half of what Officer Fidoe had seized.

28. Officer Fidoe asked several officers what had happened, but department leadership never made any inquiry into the missing money.

29. When it became clear that the chief of police was ignoring the theft of half a million dollars from the evidence room, Officer Fidoe went to the law director to report it.

30. The law director immediately shut down the discussion: "Get out of my office and keep your fucking mouth shut," he warned.

31.  As a junior officer on the force, Officer Fidoe was at a dead end. He followed the advice of counsel and kept his mouth shut.

32.  But it was hardly the last act of corruption he would see at the department.

**Officer Fidoe establishes a track record of bravery and exceptionally high performance.**

33.  Before joining the Twinsburg Police Department, Officer Fidoe spent 18 months as deputy for the Stark County Sheriff's Office.

34.  As a deputy, Officer Fidoe was twice commended for his life-saving efforts, including his willingness to rush into a burning apartment building to rescue residents trapped inside.

35.  Later that year, the City of Twinsburg hired him as a patrol officer.

36.  Within months, he received the call every officer dreads: his colleague, Officer Joshua Miktarian, had just been shot during a traffic stop.

37.  Officer Fidoe rushed to the scene. Unsure where the shooter was and when he would fire next, another officer was already there but stayed hiding in his car.

38.  But Officer Fidoe and Officer Ken Klein rushed to Officer Miktarian and dragged him to safety.

39.  While the first officer on the scene remained safely in his car, Officer Fidoe and Officer Klein attempted to administer life-saving treatment.

40.  But it was too late. Officer Miktarian was pronounced dead soon after.

41.  Despite the trauma associated with the death of his friend and colleague, Officer Fidoe recommitted to excellence as a police officer.

42.  In his first full year with the department, Officer Fidoe was already outperforming his peers on a variety of metrics.

43. For instance, he was personally responsible for nearly a third of the department's OVI arrests in 2009.

44. On the City's recommendation, MADD named Officer Fidoe its "Top Cop" for 2010.

45. When he won the award, he was already leading the department for OVI arrests in 2010, as well.

46. Throughout his employment, Officer Fidoe has continued to maintain similarly high performance.

47. He also went above and beyond expectations to develop his skills and advance the profession of law enforcement.

48. For example, Officer Fidoe has dedicated his time with the City to improving the department's field operations:

    a. After the department's armorer was forced out with no money left for operations, Officer Fidoe stepped in, secured grant funding for the program and coordinated the construction of an armory with donated materials and time.

    b. When the Department decided to move to a new service pistol, Officer Fidoe arranged training for himself and another officer. When the pistol manufacturer's full training protocol proved cost-prohibitive, he devised a new training program using virtual ammunition that saved money and allowed the department to roll out the new weapons more quickly. His program has since been adopted by police departments in Hudson, Fairlawn, Copley, Macedonia, and Northfield Village.

    c. Officer Fidoe took over the department's firearms-training programs and rebuilt them to better address the threats faced in modern policing. With the cooperation of local businesses, he has expanded training beyond the gun range to larger

facilities to train officers not only on the use of firearms, but also on other, less-lethal weapons.

d.      He also secured grants and other arrangements to facilitate Force Science Institute training, training on Pepperball weapons, and armorer-certification renewal.

49.    Officer Fidoe committed still more time to professionalizing the department's 19th-century administrative operations:

a.      He created a new field-training program, drafting a new field manual and establishing consistent and uniform evaluation methods to reduce scoring discrepancies between officers. Several other departments have since adopted his program.

b.      He created a record-retention system to catalog the department's paper and electronic records, dispose of obsolete archival materials, and comply with the City's obligations under Ohio Rev. Code § 149.351.

c.      He created new, electronic forms to replace outdated paper forms floating around the station, allowing the department to centralize its forms and reduce the time officers spend filling them out.

d.      He compiled reference materials to enable officers to more efficiently complete paperwork and other tasks at their desks.

e.      He prepared and acquired vinyl maps of the city and other important locations to mount on walls throughout the station, enabling officers to better familiarize themselves with the layout of school buildings, parks, and the city itself.

50.    Officer Fidoe also spent countless hours on projects to improve the department's community relations, both locally and nationally:

a.　After Officer Miktarian's death, he served as the department's representative at countless funerals for other officers killed in the line of duty and arranged a variety of remembrances for Officer Miktarian.

b.　He grew the department's Shop With A Cop program from a small operation to a massive event with a $20,000 budget, and more than 100 volunteers taking 88 children shopping for Christmas presents they would not otherwise have.

c.　As vice president of the Twinsburg Police Association, he arranged scholarships, support for the Special Olympics, and food drives.

d.　He revamped the curriculum for an instructional-skills course through the Ohio Peace Officer Training Academy at Lakeland Community College.

e.　The Ohio Tactical Officers' Association relies on Officer Fidoe to teach "high-threat close quarters battle" tactics to SWAT officers throughout the state.

f.　He created a forms database for the Summit County's Metro SWAT team to smooth its operations and keep members up to date on their training requirements. He also rewrote the team's operations manual, which the National Tactical Officers Association now touts as a national model.

51.　While working for the City, Officer Fidoe also earned a bachelor's degree in criminal justice at Ashland University and then a master's degree from Bowling Green State University. He earned top marks at both schools.

**Officer Bartulovic overcomes pervasive sex discrimination to establish a track record as a rising star in the department.**

52.　As he navigated the internal problems in the department, Officer Fidoe found allies among a group of several officers committed to improving themselves, their department, and the profession of law enforcement.

53. Among them was Officer Bartulovic, who came to the department with an already-established reputation for excellence.

54. As a Twinsburg native, Officer Bartulovic remembers the night Officer Miktarian was murdered. The heartbreak of that night inspired her to become a police officer herself to carry on his work and help protect her community from ever going through a night like that again.

55. By the time she graduated on the dean's list from the University of Mount Union in 2019, she had been the recipient of the school's Rebecca Stevens Criminal Justice Student Award, the Special Agent Joe Russ Memorial Award, and the Joshua Miktarian scholarship.

56. Officer Bartulovic completed her probationary period with the Twinsburg Police Department in June 2021.

57. The next year, the City, the American Red Cross, and the National Association of Police Officers each recognized her for heroism in saving two separate people's lives in separate calls on a single shift.

58. By 2023, her professionalism and commitment to excellence led the department to designate her as the training officer for field-sobriety tests and high-risk traffic stops.

59. The Metro SWAT team also recruited her to its Crisis Intervention Team as a hostage negotiator.

60. But Officer Bartulovic's accomplishment came in spite of—rather than because of—the leadership in the City of Twinsburg.

61. Like the other women in the department, Officer Bartulovic was subjected to constant harassment and discrimination that was not directed at her male colleagues.

62. Throughout her employment there, Officer Bartulovic's commanding officers have degraded and belittled her, subjecting her to standards never enforced against her male colleagues.

    a. Lt. Ternosky consistently refuses to address Officer Bartulovic as an officer, berating her like a child rather than an adult. Male officers are not addressed the same way.

    b. In April 2021, Officer Bartulovic and a male officer were discussing an ongoing promotional process and which of their colleagues they believed would best advance the department's objectives. When Lt. Ternosky learned about the conversation, he found her, cornered her and reprimanded her for talking about supervisors. Officer Bartulovic was thereafter forbidden from "gossiping"; the male officer with whom she had been talking was promoted to detective.

    c. In October 2022, Officer Bartulovic requested to take several training courses. Although she offered to pay for the courses out of her own pocket, use her own vehicle to attend them, and declined the standard per diem, the department said there wasn't enough money for extra training courses and denied all of her applications. The City approved training courses for male officers.

    d. Later that month, Officer Bartulovic sought approval for a special assignment as a hostage negotiator with Metro SWAT, but the City rejected her request.

    e. Sgt. Sawyer then rejected her request because Officer Bartulovic had only been with the department for three years, saying she needed more experience before joining SWAT. The City does not limit male officers with three years of

experience from applying for SWAT; indeed, Sgt. Sawyer himself had joined SWAT after three years on the force.

f.      Sgt. Mohorick likewise rejected her request, telling her she wasn't fit for the assignment unless she could run a 5K. The SWAT team has its own rigorous physical-fitness standards for members, and the City does not require its male officers to achieve additional arbitrary fitness goals before joining the SWAT team.

g.      In January 2023, Officer Bartulovic notified Sgt. Mohorick that she wanted to become a field-training officer. Sgt. Mohorick denied her request, citing Officer Bartulovic's "resting bitch face." The City does not evaluate its male officers for resting bitch face before making them field-training officers.

63.    Officer Bartulovic is also subject to comments and criticism about her body that her male colleagues do not have to deal with.

a.      Shortly after she was assigned to him, Lt. Ternosky chided Officer Bartulovic when he discovered that she had eaten a second piece of pizza during the shift.

b.      While Officer Bartulovic was away, Lt. Ternosky gathered male officers around her desk to look at pictures of a man she was dating, making jokes about whether he was big enough to be involved with her.

**Corruption continues to run rampant in the Twinsburg Police Department.**

64.    Despite their efforts to keep their heads down and do their best work, Officers Fidoe and Bartulovic have continually witnessed corruption in the department.

65.    They know of several officers who have continued to steal time and resources from the City:

a. Defendant Mason regularly uses his city vehicle for prohibited personal use, including long-haul trips to watch his son's baseball games. When a baseball went through the windshield during one of those games during an unauthorized trip, Defendant Mason simply took the car to the Service Department and forced them to repair the damage at taxpayer expense.

b. Lt. Donato routinely uses City time and resources to generate personal profit. For instance, he ordered Officer Fidoe to stop running traffic-enforcement so he could use Officer Fidoe's radar gun for a paid teaching job in another county.

c. While working a security detail at GetGo, Lt. Donato gave his FuelPerks card to the clerk on duty and forced him to scan it with each customer's purchase. Over the course of months, this scheme gave Lt. Donato massive discounts on fuel purchases to which he was not entitled. Giant Eagle discovered the fraud and reported it to the City. The clerk was fired; Donato was promoted to sergeant, and then again to lieutenant.

66. Several officers have used their official authority to ensure their preferred criminals can break the law with impunity:

a. When a patrol officer found a captain from the Cleveland Police Department drunk on the side of the road, sitting in a puddle of his own urine, Lt. Waltz ordered the patrol officer to give him "a break" because he was a police officer and just let his wife take him home instead.

b. In October 31, 2021, police officers were dispatched to a massive house party on Andover Drive, where unsupervised teenagers had been drinking enough to require emergency medical treatment. After learning that his son, Tyler Mason,

was among the suspects at the party, Defendant Mason contacted a patrol officer—through his son's cell phone rather than through dispatch—to give secret instructions on how to handle the incident. As soon as the phone call ended, the officer let the chief's son wander away, while other suspects were placed into a diversion program.

c. When school officials began doling out discipline to the students found at the Halloween party, Defendant Mason coerced school administrators to let his son off the hook to preserve his prospects with college recruiters.

d. When local K-9 teams conducted a search for drugs in the parking lot of Twinsburg High School, a dog alerted to the presence of drugs in a car driven by Defendant Mason's daughter, Jessica Mason. For any other student, that information would be recorded through dispatch, a school-resource officer would be summoned to immediately facilitate a search of the car, and the results would have been recorded. Instead, Lt. Donato ensured that the information was not dispatched back to the station and concealed information about the hit from the school-resource officer until later in the shift.

e. Due to rampant speeding problems, the City devised a special detail where an officer would spend half their time every day targeting speeders on Glenwood Drive, and the other half on other problem areas. Because problems on Glenwood Drive were so bad, officers were ordered not to issue verbal warnings. But when his wife was pulled over traveling at speeds approaching double the posted limit on Glenwood Drive, Defendant Mason called the officer who had stopped her and ordered her to let his wife off with a warning.

67. Several officers have tampered with records and evidence to benefit their associates and conceal their own misconduct.

  a. When Lt. Donato assaulted an unarmed and noncombative motorist, he falsified records and sought to conceal video evidence of his crimes against the driver.

  b. When Defendant Mason learned that his son's name had been included in the report of the Andover Drive house party, he directed Lt. Ternosky to alter the police report and purge any mention of his son.

68. Several officers have exploited their female colleagues in the department and benefited themselves by undermining their professional advancement:

  a. While still a patrol officer, Defendant Mason was in a romantic relationship with the minor daughter of a dispatcher.

  b. Officer Jeremy Vecchio terrorized a female dispatcher while they were both on duty, forcing her to watch pornography, groping her, pulling out his penis, and forcing her to touch it. The dispatcher asked the City to investigate and prosecute Officer Vecchio, but it refused. Officer Vecchio remains on duty.

  c. Lt. Scarl spread false rumors about the sex life of a new officer in the training program, undermining her effectiveness and credibility with other officers. Officer Fidoe alerted the chief, who handed the allegations off to his Assistant Chief Robert Gonchowski. Gonchowski immediately disclosed all the details of the investigation to Lt. Scarl and assured him that he was going to "take care of it" for him. After the chief took over the investigation, the City imposed no discipline on Lt. Scarl and instead allowed him to ride out his employment until retirement.

d.      Lt. Ternosky consistently targets female employees with out-of-control tirades about their performance and personal conduct. One officer who was a special target of his outburst suffered a stroke while on duty as a result of the stress associated with his harassment.

**Officer Fidoe and Officer Bartulovic engage in concerted activity to oppose discrimination on the basis of sex.**

69. With the problems growing intolerable, Officers Fidoe and Bartulovic began to look for opportunities to bring reform to the department.

70. Along with Officer Matthew Pfeifer, their union steward, the officers began digging deeper into cases of corruption, harassment, and record tampering.

71. As they did so, they engaged in various forms of activity protected under the First Amendment, including but not limited to associating with each other to work in the public interest, associating with union officials and counsel to protect their own interests, and lodging complaints about conditions within the department.

72. On January 29, 2024, counsel for the officers submitted a request for access to public records of various crimes committed by Defendant Mason's son, daughter, and wife.

**Defendants Mason and Donato fabricate a pretext for termination**

73. Recognizing a team of well-trained investigators inside the Department was a threat to their ability to exploit for their personal benefit, Defendants Mason and Donato quickly began looking for ways to put them out of business.

74. Looking to both punish them and prevent them from learning any more, they began initiating disciplinary actions, and falsifying evidence to support those allegations.

75. Approximately 36 hours after they requested records about his family's crimes, Chief Mason issued notices of investigatory interviews to both Officer Fidoe and Officer Bartulovic.

76. In need of a pretext that could inflict the maximum damage on them personally and professionally, they fabricated—out of whole cloth—a theory that Officers Fidoe and Bartulovic were involved in an "inappropriate relationship" in violation of the City's harassment policy.

77. They had no factual basis for that accusation. Defendant Mason would later admit under oath that he never had any evidence of such relationship.

78. Nonetheless, he and Defendant Donato worked up an investigatory record aimed at extorting the officers into resigning their positions.

79. Lt. Donato's report was full of lies.

80. He purported to compile a list of instances where he caught Officer Fidoe or Officer Bartulovic spending long stretches of time not working, but the City's own records prove that those accusations are false.

81. For instance, the first entry on his spreadsheet accused Officer Fidoe and Officer Bartulovic of sitting idle together in a restaurant parking lot from 1:16 to 1:30 p.m.:

| DATE | TIME | MINUTES | LOCATION | NOTES | PICTURE # |
|---|---|---|---|---|---|
| 1/19/2023 | 1316-1330 | 14 | D'Angelos lot | OFFICER 1 and OFFICER 2 parked car-to-car. OFFICER 2 white Jeep. | 153-156 |

82. But the City's computer-assisted dispatch system shows that Officer Fidoe was working an alarm call 12 minutes away from that restaurant from 1:14 p.m. to 1:28 p.m.:



83.    Lt. Donato also lied about Officer Fidoe and Officer Bartulovic sitting idle in that same restaurant parking lot again on February 24, 2023, from 6:37 to 6:55 p.m. But again, the City's CAD system shows that Officer Fidoe was handling another call, more than 10 minutes away, from 6:52 to 6:55 p.m.:



84. Lt. Donato also lied about Officer Fidoe and Officer Bartulovic sitting idle again in a cul-de-sac on April 17, 2023, from 4:13 to 5:15 p.m. Again, the City's CAD system shows Officer Fidoe was handling a call during that period:



85.   Lt. Donato also lied about Officer Bartulovic sitting idle in the Old School parking lot on May 29, 2023 from 4:01 to 5:20 p.m. The CAD system shows she was actually responding to a call at Sheetz at 4:42 p.m.



86.    Lt. Donato also lied about Officer Bartulovic sitting idle in a church parking lot on May

31, 2023 from 9:11 to 10:45 p.m. But the CAD system shows that she was actually

working a missing-person call from 9:25 to 9:58 p.m.:



87.     Lt. Donato also lied about Officer Bartulovic sitting idle in the parking lot of a vacant business from 12:41 to 1:17 a.m. The CAD system shows she was actually busy executing a traffic stop, arresting a passenger with warrants, and transporting her to jail from 12:41 to 1:17 a.m.:



88.     Lt. Donato also lied about Officer Fidoe sitting idle by himself in the Old School parking

lot on May 30, 2023, from 8 to 8:50 a.m. The CAD system shows that Officer Fidoe was

dispatched to and arrived at an accident miles away one minute later:



89. Lt. Donato also lied about Officer Fidoe and Officer Bartulovic sitting idle again later that same day from 12:22 to 12:48 p.m. The report curiously says they were parked together during that time in the parking lot of a vacant office—but also at the Hilton Garden Inn, miles away. But again, the CAD system shows otherwise; Officer Fidoe was actually patrolling on I-480 at 12:32 p.m., when he discovered a large pile of gravel dumped on the freeway.



90. Lt. Donato also lied about Officer Bartulovic sitting idle on June 28, 2023 from 10:10 to 10:36 p.m. in the parking lot of a clothing store. But the CAD system shows that she was working a traffic-enforcement detail from that parking lot; she stopped a driver over across the street at 10:20 p.m., issued a warning, and cleared the stop at 10:23 p.m.:



91. Relying on these and other lies, Defendant Mason and Defendant Donato argued that the City should terminate Officer Fidoe and Officer Bartulovic.

92. Despite knowing that Lt. Donato was lying, Defendant Scaffide allowed the City to press forward with it.

**The City attempts to circumvent Officer Fidoe and Officer Bartulovic's due-process rights by intimidating them into resigning.**

93. Under *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), Officer Fidoe and Officer Bartulovic have a right to due process before being deprived of their employment.

94. And as members of the Ohio Patrolmen's Benevolent Association, they had the right under their collective-bargaining agreement with the City to be disciplined only with just cause, in a timely manner, and pursuant to agreed-on procedures.

95. But given the City's track record of abusing its disciplinary authority—all discipline subjected to the grievance procedure in the last several years had been reversed—Chief Mason sought to circumvent those procedures and bully Officer Fidoe and Officer Bartulovic into giving up their rights to arbitrate.

96. Chief Mason enlisted Attorney Michael Cicero to reach out to the officers through their union representatives and deliver an ultimatum. They had two choices:

   a. The City could add Lt. Donato's false report to their personnel files, proceed with termination proceedings, and add their names to the *Brady* list it submits to the Summit County Prosecutor's Office—effectively ending their careers as officers.

   b. Or they could quit their jobs and promise never to sue the City for violating their rights. In exchange, the City would destroy the records of its investigation into them.

97. Officers Fidoe and Bartulovic refused the City's offer. They remained in their positions and prepared to fight whatever discipline the City threw at them.

**The City enlists a quack polygrapher to rubber stamp their findings**

98. Looking for outside validation, the City hired Defendant Poly-Tech Associates, Inc., to conduct polygraph examinations of Officers Fidoe and Bartulovic.

99. Its owner, Defendant Evans, is well known in the law-enforcement community as the go-to polygrapher for departments or unions who need a polygraph examination to reach a preordained result.

100. The City directed Defendant Evans to conduct the examinations of Officers Fidoe and Bartulovic with the understanding that it needed him to conclude that both of them were lying.

101. Defendant Evans and his company agreed to the assignment.

102. When Officers Fidoe and Bartulovic appeared for their examinations, Defendant Evans threw protocol out the window.

103. While polygraphy is supposed to be conducted under rigorously tight conditions, Defendant Evans essentially freestyled with Officers Fidoe and Bartulovic, making up questions on the fly, changing equipment midstream, and permitting Defendant Donato to alter the course of the examination.

104. The examination returned results that were essentially unusable for any purpose.

105. Nonetheless, Defendant Evans drafted a report confirming what the City hired him to confirm: that his machines had detected dishonesty.

**The City accelerates the disciplinary process straight to termination**

106. After getting the results it had paid for, the City summoned Officers Fidoe and Bartulovic to disciplinary proceedings.

107. During those proceedings, they presented evidence demonstrating that they were telling the truth and that the City's own records proved that Defendant Donato was lying.

108. But the hearings were never actually meant to provide any meaningful form of review of the allegations; they were merely a formality on the way to the termination the City had already promised them.

109. The City soon followed up by placing Officers Fidoe and Bartulovic on administrative leave.

110. The same day, it found a reason to put Officer Pfeifer—who had continued to investigate the misconduct alongside Officers Fidoe and Bartulovic—on administrative leave, as well, based on an allegation of misconduct that it had ignored for 10 months.

111. The officers sought to challenge the discipline through the union, but the fix was in. It extended administrative leave for all three about a month later, and then it terminated them all.

112. Although the City followed through on its threat to put them on the *Brady* list, both Officer Fidoe and Officer Bartulovic were eventually able to find work as patrol officers again. Both officers have always had stellar records, while chiefs around Northeast Ohio know that the Twinsburg Police Department is beset with corruption.

**Plaintiffs suffered injuries as a result of Defendants' misconduct**

113. Officers Fidoe and Bartulovic suffered injuries as a result of Defendants' reckless, intentional, or willful or wanton misconduct. Those injuries include, but are not limited to:

   a.    Economic injuries resulting from being put out of work.

   b.    Reputational injuries from the City's repeated public statements attacking them.

   c.    Emotional distress associated with a years-long fight to clear their names.

114. They have also incurred thousands of dollars in legal bills as they have sought to build a case to protect themselves from discipline and challenge their terminations.

115. Defendants acted willfully, egregiously, maliciously, in bad faith, and in a wanton or reckless manner.

116. They took adverse actions against Officers Fidoe and Bartulovic to retaliate against them for exercising their rights under the First Amendment and state law, they fabricated factual bases for taking those actions, they knew that doing so was unlawful, they knew

that doing so was likely to injure Officers Fidoe and Bartulovic, and they did so in hopes of injuring them. Their conduct is worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

**Officers Fidoe and Bartulovic's injuries were the result of municipal policy**

117. Officers Fidoe and Bartulovic's terminations were not the result of rogue employees. Rather, they were the result of City policies or customs made by employees whose edicts or acts represent official policy.

118. Their terminations were imposed by the mayor himself and repeatedly endorsed by City Council.

## CLAIM 1
### FIRST AMENDMENT RETALIATION (42 U.S.C. § 1983)

119. Officers Fidoe and Bartulovic re-incorporate all the preceding allegations.

120. Under the First Amendment, Officers Fidoe and Bartulovic enjoy a right to free speech, freedom of association, freedom of assembly, and freedom to petition the government for redress of grievances.

121. The Civil Rights Act of 1871, 42 U.S.C. § 1983, authorizes civil actions, suits in equity, and other relief to any person who is subjected to a deprivation of any rights, privileges, or immunities secured by the Constitution and laws by a person acting under color of state law.

122. Throughout their time working for the City of Twinsburg, Officers Fidoe and Bartulovic engaged in activity protected by the First Amendment.

123. Seeking to punish that activity and deter any more, Defendant Evans and Poly-Tech conspired with the other Defendants to take adverse actions against them, including termination of their employment.

## CLAIM 2
### EQUAL PROTECTION VIOLATION (42 U.S.C. § 1983)

124. Officers Fidoe and Bartulovic re-incorporate all the preceding allegations.

125. Under the Fourteenth Amendment, Officers Fidoe and Bartulovic enjoy a right to equal protection of the laws without regard to their exercise of his legal rights.

126. The Civil Rights Act of 1871, 42 U.S.C. § 1983, authorizes civil actions, suits in equity, and other relief to any person who is subjected to a deprivation of any rights, privileges, or immunities secured by the Constitution and laws by a person acting under color of state law.

127. But Defendants have one set of rules for those who support them and their policies, and another set of rules for those who are critical of them and their policies.

128. Officers Fidoe and Bartulovic are part of a class of people—including other officers and Twinsburg residents—who are critical of Defendants and their policies.

129. In disciplining Officers Fidoe and Bartulovic, Defendants repeatedly invoked rules and policies that they do not enforce against similarly situated officers.

130. Their discipline therefore violated Officers Fidoe and Bartulovic's right to equal protection.

## CLAIM 3
### CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS—42 U.S.C. § 1985(3)
### (AGAINST ALL DEFENDANTS)

131. Officers Fidoe and Bartulovic re-incorporate all the preceding allegations.

132. Defendants conspired with each other with the purpose of depriving Officers Fidoe and Bartulovic of the equal protection of the law as they exercised their constitutional and statutory rights, including but not limited to their freedom of speech, assembly, and petition.

133. Defendants' purpose in this conspiracy was to deprive Officers Fidoe and Bartulovic of equal privileges and immunities of the law, and to prevent or hinder authorities from securing to all persons the equal protection of the rights they sought to exercise.

134. In reaching their agreement, Defendants were motivated by a discriminatory animus against Officers Fidoe and Bartulovic, targeting them because of the content of their speech and their opposition to those with relationships to members of the conspiracy.

## CLAIM 4
### INTERFERENCE WITH CIVIL RIGHTS

135. Officers Fidoe and Bartulovic re-incorporate all the preceding allegations.

136. Under Ohio Rev. Code § 2307.60, any person injured by a criminal act may recover full damages in a civil action.

137. Under Ohio Rev. Code § 2921.45, "[n]o public servant, under color of the public servant's office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right."

138. Article I, Section 11 of the Ohio Constitution protects Officers Fidoe and Bartulovic from retaliation based on the exercise of their right to "freely speak, write, and publish his sentiments on all subjects."

139. Defendant Mason, Defendant Donato, Defendant Scaffide, and the City knowingly acted under color of their office, employment, or authority to deprive Officers Fidoe and Bartulovic of their rights by interfering with their ability to fulfill their professional responsibilities and terminating them in retaliation for the protected activities described above.

140. Defendant Evans and Defendant Poly-Tech conspired with, aided and abetted Defendant Mason, Defendant Donato, Defendant Scaffide, and the City as they interfered with Officers Fidoe and Bartulovic's rights.

## CLAIM 5
### WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

141. Officers Fidoe and Bartulovic re-incorporate all the preceding allegations.

142. Article I, Section 11 of the Ohio Constitution and Ohio Rev. Code § 4113.52 manifest a clear public policy supporting the freedom to speak about criminal misconduct by government officials.

143. Permitting Defendants to terminate Officers Fidoe and Bartulovic's employment for exercising those rights jeopardizes that policy.

144. Defendants were motivated by Officers Fidoe and Bartulovic's exercise of those rights when they terminated their employment.

145. Defendants had no overriding legitimate business justification for dismissing Officers Fidoe and Bartulovic.

## CLAIM 6
### FALSIFICATION

146. Officers Fidoe and Bartulovic re-incorporate all the preceding allegations.

147. Under Ohio Rev. Code § 2921.13, "[n]o person shall knowingly make a false statement, or knowingly swear or affirm the truth of a false statement previously made … in any official proceeding [or] with purpose to mislead a public official in performing the public official's official function."

148. Defendant Donato knowingly made false statements during an official proceeding with purpose to mislead officials in performing their official functions when considering Officers Fidoe and Bartulovic's termination.

149. As a direct and proximate result of Defendant Donato's actions, Officers Fidoe and Bartulovic have suffered and will continue to suffer economic and non-economic damages for which Defendants are liable.

### PRAYER FOR RELIEF

Plaintiffs therefore request that the Court:

A. Enter judgment in Plaintiffs' favor on all claims for relief;

B. Declare that Defendants' acts and conduct constitute violations of Article I, Section 11 of the Ohio Constitution and of the First and Fourteenth Amendments to the United States Constitution, as well as violations of 42 U.S.C. §§ 1983 and 1985(3);

C. Award injunctive relief barring further retaliation against Plaintiffs;

D. Declare that Defendants are liable for damages on all claims brought against them;

E. Award full compensatory damages of more than $25,000, including, but not limited to, damages for pain and suffering, mental anguish, and emotional distress that Plaintiffs have suffered and are reasonably certain to suffer in the future;

F. Award punitive and exemplary damages for Defendants' egregious, willful, and malicious conduct;

G. Award pre- and post-judgment interest at the highest lawful rate;

H. Award reasonable attorneys' fees and all other available costs of suit; and

I. Award all other relief in law or equity that the Court deems equitable, just, and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues within this complaint.

Respectfully submitted,

*/s/Brian D. Bardwell*
Brian D. Bardwell (0098423)
c/o Speech Law, LLC
4403 Saint Clair Ave, Suite 400
Cleveland, OH 44103-1125
216-912-2195 Phone/Fax
brian.bardwell@speech.law
*Attorney for Plaintiffs Daniel Fidoe and Olivia Bartulovic*