RICHARD BALES

Ex. 1 - Fidoe Arbitration Award

**Federal Mediation & Conciliation Service**
**Case No. 240515-06160**
**Arbitrator Richard Bales**

**In the Matter of Arbitration between:**

| | | |
|---|---|---|
| **Ohio Patrolmen's Benevolent Association** | **Grievance #:** | **OPBA 05488** |
| | **Grievant:** | **Daniel Fidoe** |
| **and** | **Grievance:** | **May 1, 2024** |
| | **Hearing:** | **January 20-22, 2026** |
| | **Briefs:** | **March 14, 2026** |
| **City of Twinsburg** | **Decision:** | **March 28, 2026** |

---

**For OPBA:** **Adam M. Chaloupka**
**For City:** **City Law Director Matthew J. Vazzana, Max V. Rieker, Brad M. Zebedis**

---

**Award**

## I. Background

This case arises from a series of events involving Officer Daniel Fidoe's on-duty conduct, the City's internal investigation of that conduct, and the statements made by Officer Fidoe during that investigation. The record includes evidence derived from vehicle-location systems, witness accounts, investigatory interviews, and subsequent disciplinary proceedings. The facts described below describe the development of the City's concerns, the investigative process, and the information upon which the City relied in making its decision to terminate Officer Fidoe's employment.

### A. The Parties and the Collective Bargaining Agreement (Contract)

The City of Twinsburg, Ohio (the City), is a municipal corporation located in Summit County in Northeast Ohio. Twinsburg is widely recognized as a well-governed and vibrant suburban community with a strong commitment to public safety, professional municipal services, and regional cooperation. The Twinsburg Police Department (TPD or Department) serves the residents and businesses of the City through patrol operations, investigations, and coordination with neighboring law-enforcement agencies. The Patrol Officers employed by the

City perform a wide range of duties requiring sound judgment, professionalism, and careful adherence to departmental rules and procedures.

Officer Daniel Fidoe was employed by the City as a Patrol Officer in TPD and was a member of the bargaining unit represented by the Ohio Patrolmen's Benevolent Association (OPBA). The bargaining unit consists of all full-time Patrol Officers employed by the City of Twinsburg. As a Patrol Officer, Officer Fidoe was responsible for responding to calls for service, conducting patrol functions, enforcing laws and ordinances, and otherwise carrying out the law-enforcement duties entrusted to the Department.

OPBA is a statewide labor organization representing law-enforcement officers in municipalities and public-safety agencies throughout Ohio. OPBA serves as the exclusive collective bargaining representative for the full-time Patrol Officers employed by the City. In that capacity, OPBA negotiates collective bargaining agreements governing wages, hours, and other terms and conditions of employment, and it represents bargaining-unit members in the grievance and arbitration process established under those agreements.

The City and OPBA are parties to the *Contract Between the City of Twinsburg and the Ohio Patrolmen's Benevolent Association (Patrol)* (the Contract), effective 2023–25. This Contract was in effect at all times relevant to the Grievance at issue in this Arbitration. The Contract governs the wages, hours, and terms and conditions of employment of the Patrol Officers in the bargaining unit and includes provisions addressing employee rights, discipline, grievance handling, and arbitration. The Grievance at issue in this matter was filed and processed under the procedures established in the Contract and was ultimately submitted to arbitration for final and binding resolution.

**B. The Disciplinary Action and Grievance**

This case arises from the City's decision to discharge Officer Fidoe. The discharge followed an internal investigation conducted by TPD into several matters involving Officer Fidoe's conduct while employed as a Patrol Officer. At the conclusion of that investigation, the City determined that disciplinary action was warranted and ultimately imposed the penalty of discharge.

OPBA filed a Grievance challenging the discharge on behalf of Officer Fidoe pursuant to the procedures set forth in the Contract. The Grievance alleged that the City lacked just cause for the discharge and sought appropriate relief. The Grievance was processed through the steps of the contractual grievance procedure but was not resolved during those steps. OPBA therefore invoked arbitration under the Contract.

## II. Facts

### A. Officer Fidoe's Background and Employment

Officer Daniel Fidoe was employed by the City of Twinsburg as a TPD Patrol Officer and was a member of the bargaining unit represented by OPBA. He began his employment with TPD on March 3, 2008.

As a Patrol Officer, Officer Fidoe was responsible for the duties typically associated with patrol assignments, including responding to calls for service, conducting proactive patrol within the City, enforcing traffic and criminal laws, and maintaining a visible law-enforcement presence in the community. Patrol Officers typically operate marked police cruisers and are expected to remain available to respond promptly to calls and other incidents requiring police assistance.

Officer Fidoe testified at the Arbitration hearing that he grew up on a rural hog farm and joined the United States Marine Corps at age eighteen. He advanced quickly in the Marines and was promoted to the rank of E-5 (Sergeant) approximately two years after enlisting. He testified that he was deployed to Iraq during the Iraq War, participated in the Battle for Baghdad, and was later assigned to work with a Central Intelligence Agency team tasked with searching for weapons of mass destruction.

Officer Fidoe testified that after leaving the Marine Corps he worked in a private-sector job for approximately one year before deciding to pursue a career in law enforcement. He subsequently attended a police academy and began working in law enforcement with the Starr County Sheriff's Office, where he served for approximately thirteen months. Officer Fidoe testified that he was later recruited to join TPD and began his employment with the City in March 2008. Lieutenant Brian Donato described Officer Fidoe as a "top producer" at TPD, answering more than his share of calls and traffic stops, including during the time at issue in this Grievance.

Officer Fidoe also testified about his personal life. He married in 2001 and is the father of two sons, who at the time of the arbitration hearing were seventeen and thirteen years old. The Record also reflects that Officer Fidoe is a military veteran and receives medical care through the Veterans Administration, including appointments at a VA medical facility in Akron.

Professionally, Officer Fidoe testified that he has a master's degree in criminal justice administration. At TPD he was a SWAT team member, then a SWAT Team Leader/Sniper. He testified that he was an instructor in a wide variety of weapons training, and that he was particularly proud of introducing real-world stressors into firing-range training to better simulate real-world policing conditions, and of including Dispatchers as role-players in the experiential exercises he designed.

Officer Fidoe also testified that because of his responsibilities on the TPD SWAT team, he was assigned the exclusive use of a particular patrol vehicle known as "T11". According to Officer Fidoe's testimony, T11 was equipped with specialized equipment associated with his SWAT duties, and he was generally the only officer assigned to operate T11 during patrol shifts.

In performing patrol duties, TPD officers are expected to remain attentive to their assigned responsibilities, including monitoring designated patrol areas, responding to calls for service, and maintaining availability to address incidents requiring police assistance. Although Patrol Officers may occasionally communicate or coordinate with one another while on duty, supervisors expect officers to avoid extended periods of non-work-related activity during a shift. These expectations reflect TPD's need to ensure continuous patrol coverage and prompt responses to calls for service throughout the City.

The only evidence in the Record of Officer Fidoe's prior discipline during his tenure as a TPD officer is his own testimony in an investigatory interview of February 13, 2024, in which he described previous reprimands for insubordination and co-worker relations. City Exhibit 10 at 5-7. The City proffered no further evidence of these disciplinary actions and apparently did not consider them when imposing discipline for the events giving rise to this Grievance.

## B. Officer Fidoe's On-Duty Interactions with Officer Bartulovic

### 1. Nature of the Relationship

During the period relevant to this case, Officer Fidoe worked regularly with Officer Olivia Bartulovic, who also was employed by the City as a TPD Patrol Officer. The two officers had a friendly working relationship and interacted with one another regularly while assigned to patrol duties. Their interactions included both work-related discussions and conversations about personal matters.

Officer Fidoe acknowledged during the Arbitration hearing that he and Officer Bartulovic often spoke with one another while on duty. According to Officer Fidoe's testimony, some of those conversations involved personal matters, including topics related to his prior military service and the psychological demands associated with police work. According to Officer Fidoe, Officer Bartulovic occasionally spoke with Officer Fidoe about personal matters of her own.

### 2. Locations and Frequency of Meetings

Officers Fidoe and Bartulovic met frequently during patrol shifts and sometimes remained together for extended periods of time while on duty. According to the Donato Internal Investigation Report (described in more detail below), supervisors reviewing patrol activity began to notice patterns suggesting that the two officers' patrol vehicles were often

located in the same areas of the City during portions of their shifts. City Exhibit 13. The Record also reflects that beginning in January 2023 the two officers were assigned to different patrol shifts, with Officer Fidoe working the day shift and Officer Bartulovic assigned to the night shift. Even after this shift separation, however, location data reviewed during the investigation indicated that the two officers continued to encounter one another frequently during portions of their shifts.

These encounters sometimes occurred when the officers' patrol vehicles were parked in the same location while the officers spoke with one another. In other instances, the officers encountered one another while performing patrol duties within the same general area of the City.

Officer Fidoe did not dispute that he and Officer Bartulovic interacted with one another during patrol shifts and sometimes spent time speaking while on duty. He admitted on cross examination that many of these meetings were lengthy and secretive. He also testified, however, that meetings between patrol officers in the field were not unusual, and that his meetings with Officer Bartulovic did not interfere with his ability to perform his patrol responsibilities or respond to calls for service.

**C. The City's Initial Concerns and Investigation**

**1. Suspicious Patrol Patterns**

The concerns that ultimately led to the investigation of Officer Fidoe surfaced in November 2022. At that time, Officer Ken Weinhardt reported to Lieutenant Brian Donato that a recently hired Patrol Officer had expressed concern about patrol coverage during traffic stops. According to Officer Weinhardt, the new officer—who had been out of the police academy for less than a week—reported that he was not receiving backup on traffic stops in the manner he had been instructed to expect. The new officer also reported that two other on-duty officers, Officer Fidoe and Officer Olivia Bartulovic, appeared to be spending substantial amounts of time parked together, car-to-car, during patrol shifts.

Lieutenant Donato relayed this information to Chief of Police Thomas Mason. Chief Mason testified that, after learning of these concerns, he instructed Lt. Donato to determine whether there was anything to the report. The purpose of this instruction was to determine whether the patrol patterns described by the junior officer reflected routine patrol activity or whether they suggested a potential problem requiring supervisory attention.

Following this directive, Lt. Donato began reviewing patrol activity more closely. He noticed patterns suggesting that the patrol vehicles assigned to Officers Fidoe and Bartulovic were frequently stationary in the same areas of the City during portions of their patrol shifts. City Exhibit 13.

These observations drew attention because patrol officers are ordinarily expected to remain mobile within their assigned patrol areas and to remain available to respond promptly to calls for service. The recurring proximity of the two officers' patrol vehicles, particularly when those vehicles remained in the same location for extended periods of time, prompted questions about whether the officers were spending an unusual amount of time together while on duty.

### 2. Supervisory Review and Commencement of a Formal Investigation

Consistent with Chief Mason's instructions, Lt. Donato undertook an initial review to determine whether the patterns described by the junior officer could be confirmed through available patrol records and data. He examined vehicle location data and other patrol activity records reflecting where officers' patrol vehicles had been located during particular periods of time. City Exhibit 13. This preliminary review indicated that Officers Fidoe and Bartulovic had encountered one another on a number of occasions during patrol shifts and had sometimes remained in the same locations for extended periods of time while on duty.

At this stage, the information did not establish that misconduct had occurred. The situation did, however, raise sufficient concern to warrant further inquiry into whether the two officers' on-duty activities were consistent with departmental expectations.

Lieutenant Donato discussed these observations with Chief Mason. Based on the nature of the concerns, including the possibility that the conduct could involve misuse of on-duty time, Chief Mason directed Lieutenant Donato to proceed with a formal internal investigation of the two officers. At the Arbitration hearing, Lieutenant Donato testified that TPD leadership elected to pursue a formal investigation rather than addressing the matter informally because of concern that the conduct might involve potential criminal activity, including theft of time.

## D. Vehicle Location Systems and Initial Review of Officer Fidoe's Location Data

### 1. TPD Vehicle Location Systems

Lieutenant Donato's investigation relied in significant part on electronic location data generated by TPD patrol vehicles. Twinsburg police cruisers are equipped with multiple systems that allow supervisors and dispatch personnel to monitor the location of patrol vehicles during and after a shift.

One such system operates through the mobile data terminal (MDT) installed in each patrol vehicle. The MDT functions as the laptop computer used by officers to access departmental systems while on patrol. After logging into the MDT using badge credentials,

officers may perform tasks such as running vehicle identification numbers, checking license plates or driver's licenses, communicating with other officers, and receiving calls for service through the computer-aided dispatch (CAD) system.

Connected to the MDT is an external device known as the automatic vehicle locator (AVL). The AVL transmits the location of patrol vehicles to TPD's dispatch center, where the positions of vehicles appear on a map displayed in the control room. Dispatch personnel rely on this system to determine which officers are closest to particular calls for service and to monitor officer locations during patrol shifts.

TPD patrol vehicles also contain a separate GPS system known as "Getac". The Getac system operates independently of the MDT/AVL system and stores location data in a cloud-based network managed by a third-party vendor. The system records vehicle locations using satellite triangulation and longitudinal and latitudinal coordinates, allowing the location of a patrol vehicle to be precisely determined.

**2. Lieutenant Donato's Initial Monitoring of Cruiser T11**

As noted above, Officer Fidoe was assigned the exclusive use of cruiser T11 during patrol shifts. During the course of the initial review of patrol activity, Lieutenant Donato monitored the location of cruiser T11 using available vehicle-location systems.

During this monitoring, Lieutenant Donato observed that the AVL function for cruiser T11 was not consistently active. When the AVL function is enabled, a vehicle's location appears in real time on the TPD control room map. Lieutenant Donato testified that there were periods during which cruiser T11 did not appear on that map.

The absence of AVL data during those periods limited the ability to track cruiser T11's location in real time. As a result, Lieutenant Donato relied more heavily on other available data sources, including GPS information stored on the Getac system.

Lieutenant Donato further testified that the intermittent absence of AVL data raised concerns regarding whether the system had been disabled. Based on those observations, Lieutenant Donato considered the possibility that the MDT or AVL system in cruiser T11 had been turned off or otherwise was not functioning during certain periods.

**E. Events of February 21, 2023**

The concerns identified during Lieutenant Donato's initial review came into sharper focus on February 21, 2023, when real-time and subsequently reconstructed location data associated with cruiser T11 drew particular attention to Officer Fidoe's activities during a period

of reported sick leave. The events of that date became a central point of reference in the investigation and were examined using multiple sources of electronic and documentary evidence. The following subsections describe Lt. Donato's contemporaneous observations, the documentation of those observations, and the subsequent analysis of location data bearing on Officer Fidoe's activities that morning.

### 1. Lt. Donato's Initial Observation of Cruiser T11

On the morning of February 21, 2023, while Lt. Donato's investigation was in progress, he met with Chief Mason and other City officials. One purpose of the meeting was for Lt. Donato to update them on the status of the investigation. During that meeting, a City official asked how the real-time tracking system worked. To demonstrate, Lt. Donato accessed the Getac vehicle-location system to display the current location of cruiser T11.

Unbeknownst to those present at the time, Officer Fidoe had submitted a request on the previous day for 4.25 hours of sick leave for the morning of February 21, 2023. City Exhibit 3 at 151. Lt. Donato therefore assumed that Officer Fidoe was working a normal patrol shift when he accessed the system. However, when Lt. Donato opened the Getac display for T11 to show it to Chief Mason and the other City officials, the display showed cruiser T11 parked at the residence of Officer Bartulovic. This prompted considerable concern among those present regarding Officer Fidoe's on-duty activities. [1] Lt. Donato therefore continued to monitor the location of cruiser T11 throughout the morning while gathering additional information concerning Officer Fidoe's activities during that time.

### 2. Continued Monitoring and Screenshots

While observing cruiser T11 at Officer Bartulovic's residence using the Getac system on February 21, Lt. Donato documented what he saw by capturing screenshots from the live display. Lt. Donato testified that the screenshots reflected cruiser T11 at that location at approximately 9:54 a.m., 9:55 a.m., 10:30 a.m., and 12:39 p.m. Lt. Donato further testified that he checked the system periodically during this period and that the reported location of cruiser T11 did not change during those observations.

Lieutenant Donato later supplemented these screenshots with historical GPS data and mapping analysis to determine more precisely when cruiser T11 arrived at and departed from the residence. This additional analysis was undertaken as part of the broader effort to

---

[1] The Arbitrator assumes that allegations that two City police officers are having a sexual affair on City time could be explosively damaging to the City's reputation in a way that merely sleeping on the job would not be, even though both are a misuse of City time and presumably would be subject to commensurate discipline. This assumption, however, appears nowhere in the Record, and so the Arbitrator will not rely on it for anything beyond one possible explanation for why City and TPD reacted as they did to the events of February 21, 2023.

reconstruct cruiser T11's movements during the relevant time period using multiple data sources.

### 3. Subsequent GPS Data Review

As part of the investigation, Lt. Donato later obtained additional GPS data from the Getac system for cruiser T11 for February 21, 2023. The data included recorded latitude and longitude coordinates associated with particular timestamps. According to Lt. Donato's testimony, those coordinates remained substantially unchanged from approximately 8:55 a.m. until about 12:38 p.m., indicating that the vehicle remained at the same location during that period.

Lieutenant Donato further testified that the GPS data was later plotted using mapping software. That analysis indicated that cruiser T11 arrived at Officer Bartulovic's residence at approximately 8:55 a.m. and remained there until approximately 12:38 p.m., at which point the coordinates began to change, indicating that the vehicle was moving again. Lieutenant Donato testified that this mapping analysis was consistent with the screenshots and other Getac location information reviewed during the investigation.

The operation of the Getac GPS system was also described during the Arbitration hearing by Stefan Bakken, a business analyst employed by Getac Video Solutions. Mr. Bakken testified that the system records latitude and longitude coordinates along with associated metadata, including timestamps and information relating to signal accuracy. Mr. Bakken reviewed the GPS data log for cruiser T11 for February 21, 2023, and testified that he saw no indication that the system was malfunctioning during the relevant period.

Officer Fidoe's account of his activities on February 21, 2023, is reflected in statements made during his investigatory interview of February 13, 2024, and at the Arbitration hearing, as described below in Parts II.J and II.L.

### 4. FLOCK Data and Identification of Bartulovic's Vehicle Near the VA

Lieutenant Donato also reviewed data from the FLOCK license plate reader system as part of his effort to reconstruct the movements of Officers Fidoe and Bartulovic on February 21, 2023. The FLOCK system ("FLOCK" is a brand name, not an acronym or initialism) captures images of vehicles and records license plate information at fixed locations throughout the area.

The FLOCK data reflected that a vehicle registered to Officer Bartulovic was detected in the vicinity of the VA medical facility in Akron at approximately the time of Officer Fidoe's scheduled appointment. Lieutenant Donato testified that this information was significant

because it indicated that Officer Bartulovic's personal vehicle—rather than cruiser T11—was present near the VA facility during the relevant time period.

Lieutenant Donato considered this information in conjunction with the GPS data showing cruiser T11 remaining at Officer Bartulovic's residence during the same period. Based on this combination of data sources, Lieutenant Donato understood the available evidence to indicate that cruiser T11 had not traveled to the VA facility and that a different vehicle associated with Officer Bartulovic had been present there instead.

Based on the information available at the time—including the Getac GPS data, the screenshots taken during real-time monitoring, and the FLOCK license plate reader data—Lieutenant Donato understood the events of February 21, 2023, to reflect that cruiser T11 remained at Officer Bartulovic's residence during the relevant morning hours and did not travel to the VA medical facility for Officer Fidoe's scheduled appointment. Lieutenant Donato further understood the available data to suggest that a vehicle associated with Officer Bartulovic had been present near the VA facility during that same time period. These understandings informed the direction of the investigation as it continued.

**F. Expanded GPS Review and Pattern of On-Duty Meetings**

Following the events of February 21, 2023, Lieutenant Donato conducted a broader review of patrol vehicle location data associated with Officers Fidoe and Bartulovic. This review included both historical GPS data and contemporaneous observations collected over an extended period beginning in November 2022 and continuing through July 2023.

The data reviewed by Lieutenant Donato reflected that Officers Fidoe and Bartulovic met with one another on a recurring basis during patrol shifts. These meetings occurred both when the officers were assigned to the same shift and, later, after they had been assigned to different shifts. Even after the shift separation in January 2023, the data indicated that the officers continued to encounter one another during portions of their respective shifts.

Lieutenant Donato identified a number of locations at which these meetings occurred. These locations included, among others, Crown Hill Cemetery, the Rx Building on East Aurora Road, a vacant building at 2500 East Enterprise Parkway, and commercial locations such as the Hilton Garden Inn. The Record also reflects references to additional meeting points, including Locust Grove Cemetery, Kent State University property, and a Giant Eagle location.

The nature of these encounters varied. In some instances, the patrol vehicles assigned to Officers Fidoe and Bartulovic were parked together in the same location for long periods of time while the officers spoke with one another. In other instances, the officers' vehicles were located within the same general area during portions of their patrol shifts.

With respect to location and visibility, Lt. Donato's review identified that these meetings frequently occurred in areas not readily visible to the general public. These locations included areas outside City boundaries, as well as portions of parking lots or other locations not easily observable from public roadways.

**G. Evidence of Tampering with Location Systems**

During the expanded review, Lieutenant Donato observed irregularities in the operation of the vehicle location systems associated with cruiser T11. At various times, the AVL system for cruiser T11 was not transmitting location data, resulting in gaps in the AVL record. These gaps were not consistent across all patrol vehicles and were noted in connection with specific periods during which Officer Fidoe was on duty.

The absence of AVL data during these periods limited the ability to track cruiser T11 in real time and required reliance on other available data sources, including GPS information stored on the Getac mobile data terminal (MDT). Lieutenant Donato compared AVL data with MDT-based GPS data and other available records in order to reconstruct cruiser movements during these intervals.

The Record further reflects that the availability of AVL data for cruiser T11 varied over time. At certain points, AVL functionality appeared to be active and transmitting data normally, while at other points it was inactive or not reporting. This variation was observed within relatively short timeframes rather than as a consistent, system-wide outage.

In light of these observations, Lieutenant Donato considered whether the irregularities in AVL reporting and MDT-related data could reflect intentional interference with the operation of the location systems associated with cruiser T11. This concern arose from the intermittent nature of the data gaps, their occurrence during discrete periods, and the absence of similar issues across other patrol vehicles reviewed during the same timeframe. Lieutenant Donato did not reach a final determination on this issue at this stage but identified it as a matter warranting further review.

**H. Compilation of Investigative Materials and Referral to Attorney Cicero**

On July 28, 2023, Lt. Donato compiled the data and information gathered during the course of the investigation into a set of investigative materials, including a draft memorandum summarizing his findings. This draft included location data derived from AVL and MDT systems, FLOCK information, summaries of observed patrol activity, and preliminary or tentative conclusions based on the data reviewed.

The materials prepared by Lt. Donato were not intended as a final investigative report and did not complete the investigative process. Rather, the draft memorandum and supporting materials reflected an interim compilation of data, observations, and preliminary conclusions for further review.

Following this compilation, the City determined that further review was warranted to determine whether the conduct reflected in the materials could implicate issues beyond internal policy compliance, including the possibility of time-related misconduct during paid duty hours. Accordingly, the City forwarded Lt. Donato's investigative materials, including the draft memorandum, to Attorney Michael E. Cicero for external legal review. As reflected in Attorney Cicero's January 29, 2024, memorandum to Law Director Vazzana, the City requested that Attorney Cicero review the materials "in order to ascertain whether Officers Bartulovic and/or Fidoe may have participated in either criminal activity and/or violations of written policies of the City of Twinsburg and/or [TPD]." City Exhibit 13 at pages 9-10. Attorney Cicero's review and conclusions are described in the section that follows.

**I. Independent Review by Attorney Cicero**

Attorney Cicero reviewed Lt. Donato's investigation data and draft report and concluded there was insufficient evidence to bring a criminal prosecution against either Officer Bartulovic or Officer Fidoe under Ohio law. Attorney Cicero further concluded that there was sufficient evidence that both officers violated written policies of the City and/or the Twinsburg Police Department, as outlined in Lt. Donato's draft report, and that those findings were supported by competent, credible evidence.

Attorney Cicero also concluded that the evidence supported an additional allegation that Officer Fidoe violated Policy 320, adopting TPD Policy 21, Standards of Conduct, Section 11, entitled Dishonesty or Untruthfulness, in connection with the off-duty use of the assigned take-home cruiser and the operation of the AVL system associated with that vehicle.

**J. The Investigatory Interview of February 13, 2024**

As part of the formal investigation into the events of February 21, 2023, the City conducted a recorded investigatory interview of Officer Fidoe on February 13, 2024. That interview became a central component of the disciplinary record, both for the factual account Officer Fidoe provided regarding February 21 and for the statements Officer Fidoe made concerning ongoing conduct, including interactions with Officer Bartulovic and the operation of cruiser T11. The following subsections describe the circumstances of the interview and the substance of Officer Fidoe's responses to questioning on these subjects.

### 1. Notice, Participants, and Ground Rules

On January 31, 2024, the City issued Officer Fidoe a Notice of Investigatory Interview concerning alleged misconduct related to the events of February 21, 2023. The interview was later rescheduled and took place on February 13, 2024, in the Engineering Conference Room at Twinsburg City Hall. Before the interview, the City provided Fidoe and his OPBA legal counsel with Lt. Donato's full investigation file, including all the underlying location data for cruiser T11. City Exhibit 3, pages 1-239.

The February 13 interview was conducted by Lieutenant Alan Ternosky, who was accompanied by Chief Mason. Officer Fidoe attended the interview with OPBA counsel Adam Chaloupka. Before questioning began, Lieutenant Ternosky advised Officer Fidoe that he was required to answer questions truthfully and completely, and that dishonesty during the interview could result in further discipline. The interview was audio- and video-recorded.

### 2. Questions and Answers Concerning February 21

During the February 13, 2024, investigatory interview, Lieutenant Ternosky questioned Officer Fidoe regarding his activities on February 21, 2023. This line of questioning focused on the timing of Officer Fidoe's use of sick leave, his medical appointment at the VA facility in Akron, and the presence of cruiser T11 at Officer Bartulovic's residence during the late morning hours of that day.

In response to these questions, Officer Fidoe stated that he left duty using sick time at approximately 8:45 a.m. and drove cruiser T11 to a scheduled medical appointment at the VA clinic located at 55 West Waterloo Road in Akron. Officer Fidoe stated that his vitals were taken at approximately 9:34 a.m., after which he waited to be seen by medical staff. He explained that the duration of such appointments could vary, sometimes lasting between one hour and one and a half hours depending on the nature of the visit.

According to Officer Fidoe's statements during the interview, after completing the appointment he drove cruiser T11 to Officer Bartulovic's residence, where he stopped for lunch before returning to duty. He further stated that Officer Bartulovic did not accompany him to the VA appointment and that he drove the cruiser to and from the appointment himself.

When Lt. Ternosky asked whether Officer Fidoe had been at Officer Bartulovic's residence during the time period when cruiser T11 was observed there, Officer Fidoe initially responded in the negative. When the question was clarified to ask whether he had been at the residence at any point that day in his cruiser, Officer Fidoe stated that he went there after his doctor's appointment.

The exchange included the following questions and answers:

Q: … [Cruiser T11] was observed at Officer Bartulovic's residence from 9:54 a.m. until 12:38 p.m. Were you there during that time?
A: No
* * *
Q: Were you at Officer Bartulovic's house in your Twinsburg Police Department cruiser on February 21, 2023?
A: After my doctor's appointment I did.
* * *
Q: Well, what time are you saying you were there?
* * *
A: What time I got to her place, I don't know. I stopped there. I had lunch … she had lunch waiting for us. Then I came back into work.
Q: How did you actually get to your doctor's appointment?
A: In the cruiser.
Q: You went to the doctor's appointment at approximately 9:30 a.m.
A: So, I left at 8:45. I believe that's what time I put in for sick time. I drove to Akron VA outpatient clinic.
Q: And they're putting it as going in the cruiser.
A: In the cruiser.
* * *
Q: But, from the doctor, you left and then went to Officer Bartulovic's house?
A: Correct.
* * *
Q: Did Officer Bartulovic go with you to the doctor's office?
A: No, she did not.

City Exhibit 10 at pages 73-77.

.

Officer Fidoe also stated during the interview that he had used his assigned cruiser to attend medical appointments for several years and that he understood this to be permissible when he would be returning to duty afterward. He indicated that, when he was first assigned the cruiser, he had discussed that practice with a supervisor and had been told it would not be a problem under those circumstances.

**3. Questions and Answers Concerning Meetings with Officer Bartulovic**

During the February 13, 2024, investigatory interview, Lt. Ternosky questioned Officer Fidoe regarding the frequency, duration, and circumstances of his meetings with Officer Bartulovic during duty hours. Officer Fidoe acknowledged that, particularly after Officer Bartulovic was reassigned to a different shift, the two continued to meet while he was on duty

and assigned to cruiser T11. According to Officer Fidoe, these meetings often involved Officer Bartulovic arriving in her personal vehicle to locations where he was parked during his shift. City Exhibit 10 at 24.

Officer Fidoe identified several locations where such meetings occurred, including the parking lot of the “Rx” building, Locust Grove Cemetery, and the Crown Hill parking lot. Id. at 25-26. He further acknowledged that these meetings occurred frequently and, at times, lasted for extended periods. Id. at 102.

Officer Fidoe further acknowledged that he and Officer Bartulovic did not conduct these meetings openly. As he stated during the interview:

> [W]e were trying to – we weren’t trying to be like out in the open, flying a flag going, hey, look at us, look at us, right? Because we know the opinion of both of us, especially in the last couple of years. So there was some intent there to not be just like broadcasting to the whole world. Hey, look at us, we’re sitting here and we’re talking.

City Exhibit 10 at page 30.

At the same time, Officer Fidoe stated that he did not believe these interactions interfered with his patrol responsibilities. He indicated that he remained available to respond to calls and maintained that his ability to perform his duties was not compromised by these meetings. Id. at 102–04. Officer Fidoe also expressed frustration that supervisory personnel had not previously advised him that such conduct was improper, but instead had initiated extensive surveillance and investigation. Id.

**4. Questions and Answers Concerning Alleged Tampering**

During the February 13, 2024, investigatory interview, Lt. Ternosky also questioned Officer Fidoe regarding whether he had tampered with or disabled any of the vehicle location or tracking systems associated with cruiser T11, including the CAD, GPS, or AVL systems. Officer Fidoe denied engaging in any such conduct, stating that he had not intentionally disabled, interfered with, or otherwise manipulated the operation of the location-tracking systems in his assigned cruiser. City Exhibit 10 at 96-97, 99, 102. Officer Fidoe’s responses during this portion of the interview were categorical and did not reflect any uncertainty or qualification regarding his denial of tampering.

**K. The Polygraph Examination**

Following the investigatory interview of February 13, 2024, Chief Mason directed Officer Fidoe to submit to a polygraph examination pursuant to Article 4, Section 9, of the Contract.

The examination was conducted on April 12, 2024, by William Evans, a forensic polygraph examiner with Poly-Tec Associates, Inc. The parties stipulated to the polygraph report, and no polygraph examiner testified at the arbitration hearing.

Lieutenant Donato attended the examination. During the examination, Officer Fidoe was asked questions concerning the events of February 21, 2023, including whether he drove his cruiser to the VA appointment, whether his cruiser was at Officer Bartulovic's residence during that appointment, and whether he had knowledge concerning the location of Officer Bartulovic's vehicle as reflected in FLOCK data. Officer Fidoe answered that he had driven his cruiser to the VA appointment, that his cruiser was not at Officer Bartulovic's residence during the appointment, and that he did not know whether Officer Bartulovic's vehicle had been captured by FLOCK at the relevant location. Joint Exhibit 9.

The polygraph examiner reported the examination results for all three answers as "deception indicated", based on physiological responses recorded during the testing process. Id. The polygraph results were considered by the City in determining how to proceed with the investigation, including whether further investigative steps were warranted, and are used by the Arbitrator only for the purpose of explaining the City's next steps.

**L. Officer Fidoe's Arbitration Hearing Testimony Regarding February 21, 2023**

This subsection addresses Officer Fidoe's testimony at the Arbitration Hearing concerning the events of February 21, 2023, including (1) the account Officer Fidoe provided at hearing, (2) Officer Fidoe's explanations for the discrepancy between that account and the version provided during the investigatory interview of February 13, 2024, and (3) Officer Fidoe's testimony regarding when he first realized that the earlier account was inaccurate.

**1. Revised Account of February 21, 2023**

At the Arbitration Hearing, Officer Fidoe acknowledged that the account provided during the February 13, 2024, investigatory interview was incorrect. In response to questioning by the Arbitrator, Officer Fidoe testified that the assigned police cruiser (T11) had not been used to travel to the VA appointment on February 21, 2023. Instead, Officer Fidoe testified that he drove the cruiser to Officer Bartulovic's residence, left the cruiser there, and then used Officer Bartulovic's personal vehicle to travel to the VA appointment before returning to the residence for lunch and later resuming duty.

The Arbitrator summarized this sequence of events during the testimony, and Officer Fidoe agreed that the summary accurately reflected what occurred. See Transcript (day 3) at 103. The City similarly characterizes this testimony as an acknowledgment, for the first time during the proceedings, that the cruiser remained at Officer Bartulovic's residence during the VA appointment.

During this exchange, Officer Fidoe also acknowledged that the revised account was consistent with the objective evidence presented at the hearing, including GPS-related evidence concerning the location of cruiser T11. In response to questioning, Officer Fidoe stated that he could not "refute the evidence." Transcript (day 3) at 104.

**2. Explanations for the Prior Inaccuracy**

Officer Fidoe offered several explanations at the Arbitration Hearing for the discrepancy between the February 13, 2024, interview statements and the revised account provided at hearing. He testified that, at the time of the investigatory interview, he believed the answers provided were accurate and was attempting to respond to questioning about events that had occurred approximately one year earlier.

Officer Fidoe further testified that the questioning during the interview involved multiple dates and events, which contributed to confusion and to a mistaken recollection of the events of February 21, 2023. He testified that there had been more than one occasion involving travel with Officer Bartulovic to medical appointments, and that he initially believed investigators were referring to a different trip, which contributed to the inaccurate account provided during the interview.

Officer Fidoe also testified that the process of revisiting the timeline during the investigation, including subsequent discussions and questioning, led Officer Fidoe to reconsider the earlier recollection. As part of that process, Officer Fidoe referenced the polygraph examination as the first occasion on which certain investigative information—specifically, a Flock camera image—was discussed in a manner that prompted reconsideration of the earlier account.

**3. Timing of Officer Fidoe's Realization**

The parties' post-hearing briefs identify differing interpretations of the Record concerning when Officer Fidoe first realized that the account provided during the February 13, 2024, investigatory interview was inaccurate.

During the Arbitration Hearing, in response to questioning by the Arbitrator, Officer Fidoe testified that the realization occurred "shortly after the polygraph" examination on April 12, 2024, and that the subsequent presentation of GPS-related information "solidified" that realization. Officer Fidoe further testified that references made during the polygraph examination, including discussion of a FLOCK camera image, contributed to this realization. Transcript (day 3) at 136-37.

The OPBA, by contrast, characterizes Officer Fidoe's testimony as reflecting a more gradual process. The OPBA asserts that Officer Fidoe did not immediately reach a firm conclusion following the polygraph examination, but instead began to reconsider the earlier recollection and to recognize the possibility that the February 13, 2024, account was inaccurate. According to the OPBA, Officer Fidoe's understanding developed over time as additional information was considered and the timeline was revisited.

The OPBA further contends that Officer Fidoe did not have access to all relevant GPS information at the time of the polygraph examination. See OPBA's Post-Hearing Brief at 17-18; see also Transcript (day 3) at 177-79, 211 (Fidoe). The Record reflects, however, that Lt. Donato's investigatory file—including underlying GPS data—had been provided to Officer Fidoe and the OPBA prior to the polygraph examination. The Record is less clear as to whether the mapped or visual presentation of that data, as later used to illustrate cruiser T11's movements, had been created or provided at that time.

These differing characterizations of when Officer Fidoe recognized the inaccuracy of the February 13, 2024, account are addressed further in Part V.B.1.

**M. Lieutenant Donato's Final Internal Investigation Report (April 25, 2024)**

On April 25, 2024, Lt. Donato issued a Final Report of Internal Investigation (Donato Report). City Exhibit 13. The Report summarized the investigative steps taken to that point, including the review of AVL/GPS data, MDT records, and other electronic data; Officer Fidoe's statements during the investigatory interview of February 13, 2024; and the results of the April 12, 2024, polygraph examination.

Lieutenant Donato's report incorporated the GPS data analysis described earlier in the investigation. Using data obtained from the assigned cruiser (T-11) and processed with assistance from Ohio High Intensity Drug Trafficking Area (HIDTA) (a federally supported law enforcement program that provides analytical and technical assistance in investigations), Lt. Donato plotted the vehicle's movements for February 21, 2023. The plotted data reflected that the cruiser departed the City at approximately 0845 hours, arrived at Officer Bartulovic's residence at approximately 0855 hours, remained at that location until approximately 1238 hours, and then returned to the City. City Ex. 13 at 5. Lt. Donato concluded that this data was inconsistent with Officer Fidoe's account of his activities on that date, including statements made during the investigatory interview.

Based on the totality of the investigation, Lt. Donato concluded that Officer Fidoe had violated multiple City and Department policies. The Report identified violations of Policy 101 (Oath of Office); Workplace Harassment Policy, Section III; Policy 320 (Standards of Conduct), including subsections relating to availability for work, dishonesty, competent performance, full day's work for full day's pay, insubordination, observance of rules and procedures, and use and

care of equipment; Policy 419 (Mobile Data Terminal Use); Policy 420 (Automatic Vehicle Locator System); Policy 500 (Traffic Function and Responsibility); and Policy 703 (Vehicle Use). City Exhibit 13.

Lieutenant Donato's conclusions reflected reliance on the combined investigative record, including objective electronic data, Officer Fidoe's statements during the investigatory interview, and the polygraph examination results as reported to the Department. The Final Report was provided to Officer Fidoe and OPBA counsel on April 25, 2024.

**N. The Training-Course Statements**

The events described in the next three subsections predate the February 2024 investigatory interview, the polygraph examination, and Lt. Donato's issuance of his Final Report discussed above. They arise from a separate matter involving statements attributed to Officer Fidoe during a training course in September 2023.

In September 2023, Officer Fidoe attended a First Line Supervisor training course taught by the Ohio Association of Chiefs of Police (OACP) and conducted at the Kent Police Department. The course was attended by officers from multiple agencies and ranks, including several Officers from TPD. The City compensated Officer Fidoe at his regular rate of pay for attending the training, and he attended in his capacity as a TPD Officer.

On September 26, 2023, TPD Sergeant Jeremy Mohorick reported to TPD Lieutenant Robert Waltz that Officer Dennis Sheldon of the Streetsboro Police Department had raised concerns regarding statements Officer Fidoe made during the training. Chief Mason assigned Lt. Waltz to investigate those concerns.

As part of the investigation, Lieutenant Waltz interviewed Officer Sheldon and several Officers from TPD who attended the training, including Officers Encarnacion, Hendershott, Hayes, and Vecchio. The accounts of those witnesses varied.

Officer Sheldon reported that Officer Fidoe made comments during class discussions concerning "toxic leadership", "cronyism", "corruption", and a manipulated promotional process within TPD. Officer Sheldon indicated that these remarks were made in a classroom setting, in the presence of other attendees, and on multiple occasions. See City Exhibits 21, 22. He also stated that Officer Fidoe made the statements proactively, not in response to questions asked during the class. See City Exhibit 21.

Officer Hendershott likewise reported that Officer Fidoe made comments on more than one day. According to Officer Hendershott, some remarks occurred during a class exercise and others occurred before class began, in the presence of an instructor and within earshot of other attendees. Officer Hendershott recalled statements concerning corruption, leadership, and the

administration; an allegation that a TPD lieutenant was committing felonies; a general theme of "everything [at TPD] is corrupt"; and the mayor's alleged relationship to a City of Cleveland commissioner who had been convicted of corruption. See City Exhibit 21.

Officer Encarnacion recalled that Officer Fidoe made comments during discussions with an instructor in a setting where other attendees were present, but did not recall specific details of the statements. Officers Hayes and Vecchio reported that they did not recall any specific disparaging remarks made during the training.

**O. Scheduling of the Investigatory Interview and Failure to Appear**

Before the March 6, 2024, investigatory interview occurred, the City initially scheduled an interview regarding the training-course statements for February 13, 2024. This sequence is relevant because the City later relied, in part, on Officer Fidoe's failure to appear for that interview as a basis for discipline.

By written notice dated February 6, 2024, Lt. Waltz directed Officer Fidoe to appear for an investigatory interview on February 13, 2024. The notice stated that attendance and cooperation were mandatory. The notice further stated that failure to appear could result in discipline, including termination of employment.

On February 7, 2024, OPBA counsel advised Lt. Waltz that counsel was unavailable on February 13 and requested alternative dates. On February 9, 2024, Lt. Waltz responded by requesting counsel's availability between February 13 and February 20 so the City could determine whether rescheduling would be possible. Lieutenant Waltz did not grant a continuance or cancel the February 13 interview at that time. However, neither Officer Fidoe nor OPBA counsel provided additional dates or otherwise confirmed that the February 13 interview would not proceed as scheduled.

On February 13, 2024, Lt. Waltz appeared at the scheduled time and location for the investigatory interview. He waited approximately one hour, but Officer Fidoe did not appear. No representative appeared on Officer Fidoe's behalf.

The investigatory interview was subsequently rescheduled. The rescheduled interview occurred on March 6, 2024; Officer Fidoe appeared with OPBA counsel.

**P. The Investigatory Interview and Report Regarding the Training**

At the interview of March 6, 2024, Officer Fidoe acknowledged that he participated in class discussions and that he made statements concerning leadership, corruption, and conditions within the Twinsburg Police Department and the City. Officer Fidoe stated that any

disparaging remarks identifying the department or administration were made during breaks and in conversations with other Twinsburg Officers. He denied making such remarks to the entire class. He also stated that his comments were intended to contribute to discussions about leadership, morale, and issues within the law enforcement profession.

At the same time, Officer Fidoe acknowledged making specific statements concerning TPD and City administration. During the interview, he confirmed that he discussed what he described as "toxic" leadership ,"corruption", "nepotism", "cronyism", and a lack of accountability within TPD and the City. He further stated that he told others that the issues were not limited to the Police Department but reflected a broader "city-wide" problem, which he associated with resignations and a purported hostile work environment. See City Exhibit 22 at page 4.

Officer Fidoe also acknowledged making statements concerning Mayor Sam Scaffide, including stating that the mayor was "Jimmy Dimora's right hand man."[2] Officer Fidoe testified that this statement was based on information provided to him by others, that he did not have proof of the assertion, and that he used it as an explanation for why, in his view, alleged misconduct within TPD and the City had not been addressed.

Officer Fidoe maintained that his participation in the training discussions was appropriate and consistent with the subject matter of the course: "The entire week of class was nothing but conversation about how do we fix morale, how do we improve the professionalism of the occupation, anything to do with leadership, corruption, cronyism, nepotism was touched on, schools, that was the whole weeks topic of conversation." Id. at 5. He also described widespread agreement with his assessment that the City and Police Department were both profoundly corrupt. City Exhibit 22 at pages 4-5. He stated that at one point, he stood up in class and spoke about cronyism and corruption, and that when he sat down the instructor announced that he "could not explain it better than that" and that the entire class started clapping. Id.

After Officer Fidoe's interview, Lt. Waltz spoke again with Officer Henderschott. Lieutenant Waltz asked Officer Henderschott whether cronyism or corruption were topics covered in the lesson plan of the course. Officer Henderschott replied: "No. The only time these topics were talked about was when Fidoe brought them up during class." Id. at 14. Lt. Waltz then obtained a syllabus for the course, which confirmed that these topics were not on the agenda. City Exhibit 24. The closest topics on point were "Effective Leadership Principles" and "Motivation and Discipline Issues". Id.

---

[2] "Jimmy Dimora" refers to a former Cuyahoga County Commissioner who was convicted in federal court of multiple public corruption offenses, including racketeering and bribery, arising out of a widely publicized corruption investigation. The reference, as used in the Record, was understood by the City as associating the Mayor with criminal corruption.

Based on the witness interviews and Officer Fidoe's statements, Lt. Waltz concluded that Officer Fidoe made disparaging statements concerning TPD and City administration during the training, including in settings where those statements could be overheard by officers from other agencies. At the Arbitration hearing, he acknowledged that he did not follow up with non-TPD attendees at the training beyond Officer Sheldon. Lt. Waltz explained that their input became superfluous once Officer Fidoe had admitted making the statements at issue.

**Q. The City's Disciplinary Decision**

After receiving the Donato and Waltz Reports, the City proceeded to the pre-disciplinary stage. On April 25, 2024, Human Resources Director Kalail issued three separate notices of pre-disciplinary meetings to Officer Fidoe. See Joint Exhibit 11. The notices related to the workplace relationship investigation, the training-course statements investigation, and the insubordination allegation arising from the February 13, 2024, failure to appear.

Each notice advised Officer Fidoe that the purpose of the pre-disciplinary meeting was to provide a meaningful opportunity to be heard before any disciplinary decision was made. The notices further stated that Officer Fidoe would have the opportunity to refute, explain, or otherwise respond to the allegations and evidence developed during the investigations. The City provided the notices on the same date that it provided Lt. Donato's Final Report. The pre-disciplinary meetings were scheduled for April 29, 2024, which afforded Officer Fidoe several days to review the investigative materials, including the Final Report and its supporting information.

On April 26, 2024, Officer Fidoe, through counsel, waived his right to appear at the pre-disciplinary meetings. City Exhibit 30. As a result of that waiver, the meetings did not proceed and no further statement or response was provided by Officer Fidoe at that stage of the process.

Chief Mason testified at the Arbitration hearing that, after reviewing the results of the investigations, he recommended that Officer Fidoe's employment be terminated. Chief Mason testified that credibility is fundamental to police work and that, in his view, an officer found to have been untruthful cannot continue to serve effectively in the Department.

On April 30, 2024, Mayor and Director of Public Safety Sam Scaffide issued the decision terminating Officer Fidoe's employment. Joint Exhibit 12. Specific findings cited in the termination letter included:

- Insubordination for failing to appear at the originally scheduled investigatory hearing related to the alleged disparagement at the training class.
- Disparagement of TPD and City officials at that training class.

- An inappropriate relationship with Officer Bartulovic which interfered with his patrol duties and the normal operations of TPD.
- Inappropriately using TPD cruiser T11 to meet Officer Bartulovic outside of City limits while on patrol duty.
- Inappropriately using City time to meet Officer Bartulovic in places away from traffic arteries and out of view of the general public.
- Removing, tampering with, or disabling the GPS systems in the T11 cruiser.
- Dishonesty in describing his February 21, 2023, visit to the VA in the investigatory interview of February 13, 2024.

**R. Post-Termination Developments**

In approximately February 2025, Officer Fidoe obtained employment with the Springfield Township Police Department. His employment there ended during his probationary period, whereupon he obtained employment with the City of Alliance Police Department. At the time of the Arbitration hearing, Officer Fidoe remained employed by the Alliance Police Department.

Officer Fidoe's testimony at the Arbitration hearing about his employment at Springfield Township and Alliance raises issues about the credibility of his testimony in this Arbitration hearing more generally. Critically, these post-termination developments are not topics on which the City "ambushed" Officer Fidoe at the Arbitration hearing—they all concern topics raised originally by OPBA on Officer Fidoe's direct examination. He therefore should have been fully prepared to discuss them, and to ensure the accuracy of his testimony.

**1. Testimony About Testifying While Employed by Springfield Township**

At the Arbitration hearing, Officer Fidoe testified to the following in response to questions from his OPBA attorney:

Q: At – your time at Springfield, did you testify in court on Springfield cases?
A: Yes. And actually testified on the abatement for the Red Roof Inn, and we won.
Q: So in what court did you testify?
* * *
A: I never testified in Muni Court. Just the Court of [Common Pleas].
Q: Summit County, Court of [Common Pleas]?
A: Yes.
Q: Do you recall how many times you testified while – in any case while –
A: In grand jury. I did grand jury frequently. We had a lot of felony arrests for drugs.
Q. That's also in the [Common Pleas] Court?
A. Yes.

Transcript (Day 3) at 128-29.

On cross examination, however, Officer Fidoe admitted he never testified in the case:

Q: You indicated that you testified in the court of common pleas related to a Springfield Township matter; I believe you used the phrase "abatement". …
***
Q: … Was there a prosecutor asking you questions or a civil attorney asking you questions?
A: We never even had to testify. …
Q: So you never testified?
A: I – I did not end up testifying, no.
Q: I thought on your direct examination, you said you did testify. Now you're saying you didn't?
A: I – if I misspoke – I went there to testify; I didn't actually end up taking the stand. I was next … and they decided they didn't want my story to be told.
Q: All right. So you never spoke on the record?
A: Correct.

Id. at 195-97.

**2. Testimony at Arbitration Concerning Separation from Springfield Township Police Department**

At the Arbitration hearing, Officer Fidoe testified to the following in response to questions from his OPBA attorney about an incident that occurred on July 25, 2025:

Q: So there came a time, I believe August of 2025, where you were probationarily removed from Springfield Township. … [Explain] what happened in that case. …
A: Okay. The chief and I had a disagreement on the way I handled a domestic violence call. …
* * *
Q: Did a point come in time where you had to use force on this individual?
A: Yeah. So he assaulted the female officer that showed up. She was trying to get him away from me. I kept telling [the alleged perpetrator] "Get away from me, or I'm going to taser you and you're going to go to jail."
* * *
Q: So at some point, the chief disagreed with your actions, and he removed you; correct?
A: Yea. We had a conversation. … He said once it escalated, I should have got into my cruiser and left. I was appalled. … I can't just ignore a domestic violence call.

Transcript (day 3) at 129-32. On cross examination, Officer Fidoe again testified that the suspect had "used force and assaulted a female police officer". Id. at 143-44.

However, the City attorney conducting the cross examination then showed video from the body-worn camera of the female officer who Officer Fidoe said had been assaulted. City Exhibit 40. This video captured the entire incident. It conclusively demonstrated the falsity of Officer Fidoe's testimony in multiple respects:

- The suspect never touched the female officer or did anything to put her in reasonable apprehension of harm.
- The female officer never tried to "get [the suspect] away from" Officer Fidoe. Instead, the suspect maintained at all times a distance of approximately six feet between him and either police officer.
- Officer Fidoe never said anything even remotely resembling "Get away from me, or I'm going to taser you and you're going to go to jail." Instead, Officer Fidoe verbally escalated the shouting match between him and the suspect, repeatedly.
- Officer Fidoe's badge was not visible, and he repeatedly refused the suspect's requests for his badge number.
- Officer Fidoe's tasering of the suspect was, by any conceivable definition, an appallingly inappropriate use of force. The suspect was standing motionless six feet from either officer, with his hands clasped behind his back. Thus, Officer Fidoe's characterization of a "disagreement" with Chief Simone, and his testimony that the source of that disagreement was Chief Simone's belief that Officer Fidoe should have walked away from a domestic violence call, both are misleading at best.

Officer Fidoe had no good explanation at the Arbitration hearing for the discrepancy between the video and his testimony under direct examination, apart from misremembering what had occurred. See Transcript at 201-05.

On August 18, 2025—less than a month after the domestic violence call described above—Chief Simone notified Officer Fidoe that the Springfield Township Board of Trustees had decided to terminate his employment for conduct unbecoming in relation to the incident described above. City Exhibit 34. Three days later, Officer Fidoe appealed that decision, arguing that his conduct on July 25 was "reasonable", "consistent with training", and "aimed at officer safety", and that his termination raised "serious concerns about Chief Simone's leadership approach." City Exhibit 35. Officer Fidoe's accompanying Appeal Memorandum asserted that Chief Simone's version of the July 25 incident was "one-sided", that Chief Simone "ignored controlling law, supervisory recommendations, and the totality of the circumstances", and that Chief Simone's termination of his employment reflected "a failure to align with constitutional standards, established case law, and Ohio statutory requirements." City Exhibit 36.

Officer Fidoe's reaction to his Springfield Township discharge is relevant to his credibility in this Arbitration in two respects. First, even if Officer Fidoe had misremembered the events of July 25 at the Arbitration hearing, the Arbitrator finds it highly unlikely that he would have misremembered it to this degree merely one month after the incident occurred. Second, Officer Fidoe not only mischaracterized those events, but also used his mischaracterizations to attack the credibility, professionalism, and competence of Chief Simone.

**3. Officer Fidoe's Application to the City of Alliance Police Department**

During approximately the first month of Officer Fidoe's employment with Springfield Township, he requested from Chief Simone a letter in support of his application for firearms training. Transcript (day 3) at 153-54 (Fidoe). This letter, sent by Chief Simone on October 25, 2024, stated in part:

> I strongly endorse Officer Daniel Fidoe. His background, expertise, and commitment to continuous improvement align perfectly with the standards upheld by the Springfield Township Police Department.

City Exhibit 33. Chief Simone. Id.

As described above, Chief Simone terminated Officer Fidoe's employment with Springfield Township on August 18, 2025, for "conduct unbecoming" in relation to the incident of July 25, 2025.

On September 18, 2025, Officer Fidoe submitted an application to the City of Alliance Police Department. City Exhibit 38. On that application, Officer Fidoe stated, as his reason for leaving the Springfield Township Police Department:

> Probationary Separation/Termination after Chief Simone stated I used excessive force when I deployed the taser on a drunk uncooperative male at a domestic violence call. Chief Simone further stated that my profanity on the male violated policy. Chief Simone further stated that my drive stun on the male while he was resisting arrest was done out of anger.

Id.

Officer Fidoe's statement here that the July 25 suspect was "resisting arrest" is inconsistent with the video evidence of that incident. Equally troubling was his inclusion of Chief Simone's glowing recommendation letter written before Chief Simone had effectively fired Officer Fidoe for conduct unbecoming. Officer Fidoe's inclusion of this letter was at best a misleading representation of Chief Simone's endorsement of him. Officer Fidoe's justification

for doing so was that he had disclosed the circumstances of his separation from Springfield Township on his employment application form. Transcript (day 3) at 210 (Fidoe).

**4. Relevance of Post-Termination Developments**

The events described in this subsection occurred after the City's decision to terminate Officer Fidoe's employment on April 30, 2024. For that reason, they do not bear on whether the City had just cause for that decision at the time it was made.

The events are relevant, however, for two purposes. First, they bear directly on the Arbitrator's assessment of Officer Fidoe's credibility as a witness in this proceeding. Second, they bear on the broader question—implicated by the City's stated rationale for discharge—of Officer Fidoe's ability to serve effectively as a law enforcement officer, including his ability to provide reliable testimony under oath.

The Record described in this subsection establishes that Officer Fidoe made multiple statements under oath at the Arbitration hearing that were demonstrably false or materially misleading. These were not minor discrepancies or imprecise recollections about peripheral matters. They concerned concrete events, including whether Officer Fidoe testified in court, the circumstances surrounding his use of force in a domestic violence incident, and the nature of his separation from subsequent employment.

In several instances, those statements were directly contradicted by objective evidence, including contemporaneous video recordings. When confronted with those contradictions, Officer Fidoe did not provide a persuasive explanation. His testimony instead shifted, retreated, or was reframed only after the contrary evidence was presented.

The Arbitrator does not conclude that every inaccuracy in testimony reflects intentional deception. However, the pattern reflected in this Record is not reasonably attributable to ordinary lapses in memory or the natural human tendency to recall distant events in a manner consistent with one's self-image. Rather, the Record demonstrates a willingness to provide statements that are not grounded in objective fact when doing so serves Officer Fidoe's interests, or, at minimum, a degree of willful blindness to facts that do not conform to his preferred account of events.

This finding has consequences for the Arbitrator's evaluation of the evidence in this case. Arbitration frequently requires resolution of disputed factual issues based on competing testimony. In performing that function, arbitrators often begin with the working assumption that a witness is attempting to testify truthfully, even if that testimony is imperfect or is influenced by perspective or memory lapses.

In this case, that assumption cannot be maintained with respect to Officer Fidoe's testimony. The record in Part II.Q compels the conclusion that Officer Fidoe's testimony must be evaluated with heightened scrutiny and cannot be credited where it conflicts with other reliable evidence.

The Arbitrator does not rely on these post-termination developments as an independent basis to sustain the City's discharge decision. Nor does this Award evaluate discipline based on Officer Fidoe's testimony at the Arbitration hearing. However, the credibility findings set forth here necessarily inform the Arbitrator's resolution of disputed facts elsewhere in the Record, including in Part V of this Award.

## III. Stipulated Issue

Did the City of Twinsburg have just cause to terminate Daniel Fidoe's employment, and if not, what shall the remedy be?

## IV. Relevant CBA Provisions

ARTICLE 4
EMPLOYEE RIGHTS

Section 9. An employee may only be required to submit to a polygraph examination or other truth detection device where the employee has already been charged with misconduct of such seriousness that the employee may be discharged if such charges are proven. The examiner shall focus his questioning on the specific incident or events leading to the charges and shall in no way be used to uncover unrelated acts of misconduct. The results of the examination alone shall not be used to prove the factual basis for the charges. The results of the examination shall not be determinative of the employee's guilt. Such results shall only be presented as supporting and not as conclusive evidence that the employee engaged in the misconduct with providing false statements or failure to cooperate in an investigation if he fails an examination.

ARTICLE 39
DISCIPLINE

Section 1. Disciplinary action taken by the Employer shall only be for just cause, and in a timely manner.

* * *

ARTICLE 41
ARBITRATION PROCEDURE

* * *

Section 2. The arbitrator shall have no power or authority to add to, subtract from, or in any manner alter the specific terms of this Agreement, or to make any award requiring the commission of any act prohibited by law, or to make any award that itself is contrary to law or violates any of the terms and conditions of this Agreement.

* * *

Section 4. The fees and expenses of the arbitrator and the cost of the hearing room, if any, shall be borne by the party losing the grievance. All other expenses shall be borne by the party incurring them. Neither party shall be responsible for any of the expenses incurred by the other party.

Section 6. The arbitrator's decision and award will be in writing and delivered within thirty (30) days from the date the record is closed. The decision of the arbitrator shall be binding upon the parties.

## V. Analysis

The Arbitrator turns now to the merits of the dispute. The analysis that follows addresses the parties' respective arguments concerning the applicable burden of proof and the City's asserted grounds for discipline, and then considers whether the proven conduct, viewed individually and collectively, establishes just cause for the discharge imposed.

### A. Burden of Proof

OPBA contends that discharge, as the most severe form of industrial discipline, requires proof by clear and convincing evidence. OPBA Post-Hearing Brief at 22-23. OPBA emphasizes that this heightened standard is particularly appropriate where, as here, the City alleges dishonesty. OPBA argues that arbitrators routinely require more than a preponderance of the evidence in such cases because allegations of dishonesty directly implicate an employee's character, reputation, and future employability.

OPBA further argues that a charge of dishonesty cannot be sustained absent proof of intentional or willful deceit. According to OPBA, an inaccurate or incomplete statement is insufficient; rather, the City must demonstrate that Officer Fidoe acted with a deliberate intent

to mislead. OPBA Post-Hearing Brief at 31-36. OPBA also contends that an employee's initial denial of alleged misconduct does not, standing alone, constitute dishonesty, as employees are entitled to assert innocence during an investigation. Finally, OPBA maintains that, even if misconduct is established, traditional mitigating factors remain relevant in assessing whether discharge is appropriate.

The City asserts that the appropriate burden of proof is a preponderance of the evidence. City Post-Hearing Brief at 36. The City further contends that, regardless of the applicable standard, the evidence in this case is more than sufficient to sustain the discipline imposed.

The Arbitrator need not resolve the parties' dispute regarding the applicable burden of proof because regardless of the standard, the outcome of this case would be the same. For purposes of this Award, the Arbitrator assumes, without deciding, that the City must establish all alleged misconduct by clear and convincing evidence.

**B. Just Cause for Discipline**

The City identified multiple grounds to support its decision to discharge Officer Fidoe. Each asserted basis for discipline is addressed below. The Arbitrator begins with the allegation of dishonesty concerning the events of February 21, 2023, as that issue was central to the investigation and to the City's decision-making process.

**1. Alleged Dishonesty Concerning the Events of February 21, 2023**

The allegation of dishonesty requires careful examination of both the underlying facts and the evolution of Officer Fidoe's account over time. The analysis therefore begins with a brief summary of the relevant factual framework and the competing accounts presented in the Record.

**a. Factual Framework and Competing Accounts**

The underlying facts concerning February 21, 2023, are described in Part II and will not be repeated here. In summary, the GPS data associated with cruiser T11 demonstrates that the vehicle was located at Officer Bartulovic's residence during the time period when Officer Fidoe attended a scheduled VA medical appointment. See Part II.E.

During the February 13, 2024, investigatory interview, Officer Fidoe provided a materially different account. He stated that he drove his cruiser to the VA appointment and

went to Officer Bartulovic's residence only afterward. He also denied being at her residence during the time period when the cruiser was observed there. See Part II.J.

At the Arbitration hearing, Officer Fidoe acknowledged that this account was inaccurate. He testified that he drove the cruiser to Bartulovic's residence before the appointment, left it there, used her vehicle to travel to the VA, and returned afterward. He agreed that this revised account was consistent with the GPS data. See Part II.K. Officer Fidoe attributed the earlier inaccuracies to mistake rather than intent, explaining that his investigatory interview answers were based on his recollection at the time and his understanding of the materials then provided to him.

#### b. Timing of When Officer Fidoe Realized the Prior Account Was Inaccurate

The central issue is not whether Officer Fidoe's investigatory interview account was inaccurate. It was. The critical question is when Officer Fidoe realized that the account was inaccurate and what he did, or failed to do, after reaching that realization.

OPBA contends that Officer Fidoe answered questions during the February 13, 2024, interview based on a good-faith recollection and on investigative materials that appeared incomplete and internally inconsistent. OPBA emphasizes that the materials did not present the GPS data in a clear or synthesized form and that the timeline suggested by the investigation appeared inconsistent with the VA records. Under that view, Officer Fidoe reasonably rejected the City's timeline and did not recognize the error in his recollection until the GPS data was presented in a more complete and comprehensible form at the Arbitration hearing.

The City argues that Officer Fidoe had access to sufficient information well before the hearing to recognize that his account was incorrect. The City points to the investigative materials provided to Officer Fidoe, the questioning during the interview, and the polygraph examination, during which Officer Fidoe again asserted that he drove the cruiser to the VA. The City further emphasizes that Officer Fidoe testified that he began to question his account "shortly after the polygraph", yet made no effort to correct the record prior to the Arbitration hearing.

The Record reflects that Officer Fidoe gave varying accounts of when he realized that his investigatory interview statements were inaccurate. At one point, he testified that the realization came shortly after the polygraph. At other points, he suggested that he did not accept the accuracy of the GPS evidence until it was fully presented at the Arbitration hearing. See Part II.K; Transcript (day 3) at 136-37, 177-79.

The Record also establishes that the underlying GPS data was made available to Officer Fidoe before the polygraph as part of Lieutenant Donato's investigatory file, although it is less clear whether that data had been synthesized into a visual format at that time. See Part II.K. All

these facts frame the question of whether Officer Fidoe's conduct reflects a mistaken recollection that was later corrected or a failure to correct an account that he had reason to believe was inaccurate.

**c. Arguments of the Parties**

OPBA's strongest argument is that the Record does not establish intentional deception, which is the core requirement for a dishonesty finding, particularly under a clear-and-convincing standard. See OPBA Post-Hearing Brief at 31-36. The interview of February 13, 2024, occurred nearly a year after the events in question, and Officer Fidoe was asked to reconstruct a routine day involving a medical appointment that he had no reason to memorialize. At that time, the materials provided to him were incomplete and difficult to interpret, consisting largely of screenshots and references rather than a coherent presentation of GPS data. The timeline suggested by the City appeared inconsistent with his VA records, which showed vitals taken at approximately 9:34 a.m., making the City's assertion that the cruiser was at Bartulovic's residence shortly thereafter seem implausible based on ordinary travel time. Under these circumstances, it was reasonable for Officer Fidoe to rely on his recollection and to reject a timeline that did not make sense to him. OPBA further argues there is no clear evidence that Officer Fidoe knowingly maintained a false account after the interview. The Record reflects confusion about when he began to question his recollection, and the fact that he ultimately corrected his account when presented with a clear and complete mapping of the GPS data supports the conclusion that this was a mistake rather than willful deceit. At most, OPBA would characterize this as an error in memory under stressful conditions, not dishonesty warranting serious discipline, let alone discharge.

The City's strongest argument is that this case is not about an initial mistake but about Officer Fidoe's repeated decisions to maintain a demonstrably false account after being confronted with objective evidence that called that account into question. See City's Post-Hearing Brief at 27-33, 36-38. Even if the Arbitrator accepts that the February 13 interview responses were based on faulty recollection, the Record shows that Officer Fidoe was provided with investigative materials—including GPS-related data—and was expressly confronted with the inconsistency between his account and the location evidence. He then repeated the same version of events during the polygraph examination, again asserting that he drove the cruiser to the VA and that it was not at Officer Bartulovic's residence during the appointment. By his own testimony, he began to realize "shortly after the polygraph" that his account may have been incorrect, yet he made no effort to correct the Record at any point before the Arbitration hearing. That failure is critical. TPD policy does not prohibit only initial inaccuracies; it prohibits giving misleading statements in an investigation when it is reasonable to expect reliance. Once Officer Fidoe had reason to doubt the accuracy of his statements, he had an affirmative duty to revisit the evidence and correct the Record. Instead, he maintained a version of events that was increasingly untenable in light of the available data, and only changed his account when the GPS evidence was presented in a manner that made contradiction impossible. In a law

enforcement context, where credibility is essential, that pattern—initial denial followed by continued adherence to an inaccurate account despite mounting objective evidence—constitutes dishonesty and independently supports termination.

### d. Arbitrator's Analysis and Conclusion on Intentional Misrepresentation

The evidence does not support a finding, by clear and convincing evidence, that Officer Fidoe intentionally provided a false account during the investigatory interview of February 13, 2024. The interview occurred nearly one year after the events in question, and Officer Fidoe was asked to reconstruct a routine day involving a medical appointment and intervening activity that he had no reason to memorialize at the time. The Record reflects that the questioning involved multiple dates and events, and that Officer Fidoe's recollection may have been influenced by those circumstances. On this Record, the Arbitrator is not persuaded that the initial inaccuracies in Officer Fidoe's statements, standing alone, establish willful deceit.

The analysis does not end there. The more difficult and more consequential issue is what occurred after the investigatory interview—specifically, whether and when Officer Fidoe came to recognize that his account was inaccurate, and whether he fulfilled his obligation to correct the Record once he had reason to question his prior statements.

On that issue, the weight of the evidence supports the City's position. The Record establishes that Officer Fidoe had access to the underlying GPS data before the polygraph examination and was expressly confronted with inconsistencies between his account and the City's location evidence during both the investigation and the polygraph process. Most significantly, Officer Fidoe testified that he began to realize "shortly after the polygraph" that his prior account may have been incorrect. See Part II.L.3; Transcript (day 3) at 136-37. That testimony is inconsistent with his suggestion elsewhere that he did not accept the accuracy of the GPS evidence until the Arbitration hearing.

Once Officer Fidoe reached that point—once he had reason to believe that his prior statements were inaccurate—he had an obligation to revisit the evidence and to correct the Record. That obligation arises not only from a general expectation of honesty, but specifically from TPD Standards of Conduct, Joint Exhibit 3, Section 11, which prohibits both "dishonesty" and "untruthfulness". As used in that policy, "dishonesty" addresses knowing or intentional deception, while "untruthfulness" more broadly encompasses the provision or continued maintenance of inaccurate or misleading information in circumstances where it is reasonable to expect reliance. In the context of a formal internal investigation, where TPD necessarily relies on an officer's statements in making disciplinary determinations, that standard imposes a continuing duty to ensure that prior statements remain accurate. It therefore is not sufficient for an officer to avoid making an intentionally false statement at the outset; once the officer has reason to question the accuracy of a prior account, the policy requires the officer to correct or clarify that account.

The Record reflects that Officer Fidoe did not fulfill that obligation. He did not correct his account during the polygraph examination. He did not amend or supplement his statements after reviewing the investigative materials. He did not avail himself of the pre-disciplinary process to address the discrepancy. Instead, the Record shows that the corrected account was first fully articulated at the Arbitration hearing, after the GPS evidence had been presented in a manner that made its implications unmistakable. See Part II.L.1.

This sequence of events supports a finding that, even if the initial misstatement was not intentional, Officer Fidoe knowingly allowed an inaccurate and materially misleading account to remain uncorrected during a critical stage of the investigation, and then throughout the disciplinary and grievance processes. That failure constitutes a violation of TPD's standards of honesty and integrity. In a law enforcement context, where credibility is essential to the performance of core job functions, such conduct is a serious matter warranting discipline.

At the same time, the Arbitrator does not find that this violation, standing alone, would necessarily warrant discharge. The distinction between an initial intentional falsehood and a subsequent failure to correct an inaccurate account is meaningful in assessing the degree of culpability and the appropriate penalty. The weight to be assigned to this violation in determining just cause for discharge is addressed below in conjunction with the City's other asserted grounds for discipline and the Arbitrator's overall assessment of Officer Fidoe's credibility.

### 2. Inappropriate Relationship with Officer Bartulovic and Misuse of City Time

The next issue concerns Officer Fidoe's relationship with Officer Bartulovic and the manner in which that relationship intersected with his duties while on patrol. The analysis begins with a summary of the relevant factual context, including the frequency, locations, and circumstances of their meetings during duty hours.

#### a. Factual Framework

Officers Fidoe and Bartulovic met on multiple occasions during duty hours, both before and after Officer Bartulovic was reassigned to a different shift. These meetings occurred while Officer Fidoe was on patrol and assigned to cruiser T11. See Part II.E; Part II.J. The locations included parking lots, cemeteries, and other areas that were not readily visible from public roadways, including locations outside the City's boundaries. See Part II.E; Part II.J.

The GPS data and related investigative materials reflect that these meetings were not isolated incidents, but part of a recurring pattern. The meetings varied in duration, with some lasting for extended periods of time. See Part II.E. Officer Fidoe acknowledged during the

investigatory interview that these meetings occurred frequently and that he and Officer Bartulovic did not conduct them openly. See Part II.J.

At the same time, there is no evidence in the record that Officer Fidoe failed to respond to dispatched calls or that his measurable enforcement activity—such as traffic stops or call responses—declined during the relevant period. The Record does not establish that the meetings resulted in missed calls for service or documented failures to perform assigned duties.

**b. Arguments of the Parties**

OPBA contends that the meetings between Officer Fidoe and Officer Bartulovic did not constitute misconduct warranting serious discipline. OPBA emphasizes that Officer Fidoe remained available for calls and continued to perform his patrol duties. OPBA further argues that the absence of any documented performance deficiencies or missed calls demonstrates that the meetings did not interfere with Officer Fidoe's ability to perform his job. OPBA also points to the lack of prior corrective action by supervision, arguing that if the conduct was improper, it could and should have been addressed earlier through guidance or minor discipline rather than through a retrospective investigation.

The City argues that the meetings were fundamentally inconsistent with patrol responsibilities. City's Post-Hearing Brief at 22-26. The City emphasizes that patrol duties require officers to remain visible and engaged within the community, both for deterrence and for public confidence. According to the City, the repeated practice of meeting in secluded locations—including cemeteries, areas outside City limits, and locations not visible to the public—demonstrates a deliberate effort to avoid detection and reflects a misuse of on-duty time. The City further contends that the frequency and duration of these meetings, combined with their concealed nature, establish that Officer Fidoe was not fulfilling the core expectations of patrol duty during those periods.

**c. Arbitrator's Analysis and Conclusion**

The Arbitrator finds that Officer Fidoe's conduct was inconsistent with the reasonable expectations of patrol duty. Patrol work is not measured solely by the number of calls answered or citations issued. It also serves a deterrent and community-facing function that depends in substantial part on visibility and presence. The evidence establishes that Officer Fidoe repeatedly spent time during his shift in locations that were deliberately selected to be out of public view, including areas outside the City's jurisdiction and locations such as cemeteries and secluded parking areas.

Even absent missed calls or measurable performance deficiencies, this pattern of conduct undermines the visibility and deterrent purposes of patrol and constitutes a misuse of

on-duty time. The fact that Officer Fidoe acknowledged that the meetings were not conducted openly reinforces the conclusion that the conduct was inconsistent with those expectations.

At the same time, the Arbitrator does not find that this violation, standing alone, would justify discharge. The record reflects no prior discipline for similar conduct and no evidence that Officer Fidoe had been previously directed to cease such activity. The conduct at issue is the type that could likely have been addressed through early supervisory intervention, whether informal counseling or progressive discipline. Nothing in the record suggests that Officer Fidoe would have refused to comply with such direction.

The City's decision to investigate the conduct in the manner that it did is understandable in light of the information available at the time, including reasonable concerns—heightened by the secretive and clandestine nature of the meetings—that the relationship between Officers Fidoe and Bartulovic may have involved more serious misconduct. However, the appropriate inquiry for purposes of just cause is the nature of the conduct ultimately established, not the suspicions that prompted the investigation. On this Record, the misuse of time associated with the meetings constitutes misconduct warranting discipline, but not discharge.

### 3. Alleged Insubordination for Failure to Appear for Investigatory Interview

The City asserts that Officer Fidoe engaged in insubordination by failing to appear for a scheduled investigatory interview. The analysis begins with the relevant factual context surrounding the scheduling of that interview and the communications between the parties.

#### a. Factual Framework

The alleged insubordination arises from Officer Fidoe's failure to appear for an investigatory interview initially scheduled for February 13, 2024, concerning the training-course statements. See Part II.M. Before that date, OPBA counsel advised Lieutenant Waltz that counsel was unavailable and requested alternative dates. Lieutenant Waltz responded by requesting counsel's availability but did not confirm that the February 13 interview would proceed as scheduled. See Part II.M.

Officer Fidoe did not appear for the February 13 interview. Lieutenant Waltz waited approximately one hour but did not contact Officer Fidoe or counsel to clarify the situation. The interview was subsequently rescheduled and conducted on March 6, 2024, at which time Officer Fidoe appeared with counsel and participated fully. See Part II.M.

### b. Arguments of the Parties

OPBA argues that the February 13 scheduling issue is not insubordination. See OPBA's Post-Hearing Brief at 24-27. OPBA emphasizes that insubordination requires a willful refusal to obey a clear and direct order, which is not established on this record. OPBA contends that the evidence reflects an ongoing scheduling discussion between the City and counsel, not a deliberate refusal to appear. Counsel had indicated unavailability and requested alternative dates, and the City responded by asking for availability rather than insisting that the February 13 date remained firm.

OPBA further argues that the City took no steps to confirm the interview once counsel raised scheduling concerns. Lieutenant Waltz did not send a follow-up communication confirming that the February 13 interview would proceed, nor did he attempt to contact Officer Fidoe or counsel when Officer Fidoe did not appear. According to OPBA, these facts are inconsistent with a finding of willful disobedience.

OPBA also emphasizes that the interview was promptly rescheduled and completed without difficulty on March 6, 2024, and that Officer Fidoe fully participated in that interview. OPBA argues that, at most, the February 13 incident reflects a scheduling misunderstanding that was resolved without prejudice to the investigation. OPBA further notes that Lt. Waltz did not initially treat the missed interview as a significant disciplinary issue and did not rely on it in reaching conclusions regarding the underlying investigation.

The City argues that Officer Fidoe was given a clear and direct order to appear for the February 13 interview and that the notice explicitly stated that failure to appear could constitute insubordination. City's Post-Hearing Brief at 41. The City emphasizes that neither Officer Fidoe nor OPBA provided a response confirming that the interview had been rescheduled or that Officer Fidoe was excused from appearing. Under these circumstances, the City contends that Officer Fidoe remained obligated to appear as directed and that his failure to do so constitutes insubordination.

The City further argues that Officer Fidoe acknowledged during a subsequent investigatory interview that he received the notice, understood the directive, and chose not to appear based on advice from OPBA counsel. According to the City, reliance on union advice does not excuse failure to comply with a direct order from a superior officer. The City therefore contends that the elements of insubordination are satisfied.

### c. Arbitrator's Analysis and Conclusion

Insubordination requires a willful refusal to obey a clear and direct order. While the February 13 notice directed Officer Fidoe to appear and warned that failure to do so could result in discipline, the surrounding circumstances do not support a finding of willful

disobedience. Before the scheduled interview, OPBA counsel advised Lt. Waltz that counsel was unavailable and requested alternative dates. Lieutenant Waltz responded by requesting counsel's availability but did not clearly communicate that the February 13 interview would proceed regardless.

The absence of follow-up communication is significant. Lieutenant Waltz did not confirm that the February 13 date remained in effect, nor did he attempt to contact Officer Fidoe or counsel when Officer Fidoe did not appear. These facts are more consistent with a breakdown in scheduling communication than with a deliberate refusal to comply with an order.

The subsequent course of events reinforces that conclusion. The interview was rescheduled and conducted on March 6, 2024, and Officer Fidoe appeared with counsel and participated fully. The investigation proceeded without any apparent impairment as a result of the missed February 13 date. There is also evidence that the missed interview was not initially treated as a significant act of misconduct within the investigation itself.

The Arbitrator also considers that Officer Fidoe relied on the advice of OPBA counsel in not appearing on February 13. While reliance on counsel does not categorically excuse noncompliance with a direct order, it is relevant to the question of intent. On this Record, that reliance is more consistent with a misunderstanding regarding scheduling than with a deliberate refusal to obey a directive.

Accordingly, the Arbitrator concludes that the City has not established insubordination. At most, the February 13 incident reflects a scheduling miscommunication that was later resolved when the interview was conducted. It does not provide just cause for discipline.

**4. Alleged Disparaging Remarks During Training Course**

The next issue concerns statements attributed to Officer Fidoe during the First Line Supervisor training course. The analysis begins with a summary of the factual record regarding what was said, the setting in which the statements were made, and how those statements were reported and investigated.

**a. Factual Framework**

The facts concerning Officer Fidoe's statements during the September 2023 First Line Supervisor training course are described above in Part II.L and Part II.M. Officer Fidoe attended a multi-agency training course while on duty and in his capacity as a TPD officer. During that training, he made statements concerning TPD and City leadership, including references to "corruption", "cronyism", and "toxic" leadership.

These statements were reported by Officer Sheldon of the Streetsboro Police Department, who brought the matter to the attention of Sergeant Mohorick, prompting an internal investigation. See Part II.L. Officer Fidoe subsequently acknowledged during the investigatory interview that he made statements concerning leadership and conditions within TPD and the City, although he characterized those statements as part of discussions concerning broader issues in law enforcement. See Part II.M.

**b. Arguments of the Parties**

OPBA argues that Officer Fidoe's statements do not constitute misconduct warranting discipline. See OPBA's Post-Hearing Brief at 28-30. OPBA emphasizes that the statements were made in the context of discussions about leadership, morale, and issues affecting law enforcement generally. OPBA further contends that some of the comments occurred during breaks or in smaller group settings, and therefore were not directed to the full class or intended as public statements about the Department. OPBA also argues that the City's investigation was incomplete and relied heavily on secondhand accounts, with several witnesses unable to recall specific statements. In OPBA's view, the evidence does not establish that the statements caused any actual disruption or harm beyond generalized reputational concerns.

The City argues that Officer Fidoe's statements violated TPD Policy 1022.4, which prohibits speech that compromises or damages the mission, function, or reputation of the Department. See City's Post-Hearing Brief at 38-40. The City emphasizes that Officer Fidoe attended the training in his official capacity and was expected to represent TPD professionally. The City further contends that the statements were sufficiently serious that an officer from another jurisdiction felt compelled to report them, which demonstrates their impact. The City argues that the speech was not protected because Officer Fidoe was not acting as a private citizen and that the setting of the statements—whether during class or breaks—is immaterial given the professional context.

**c. Arbitrator's Analysis and Conclusion**

Officer Fidoe admitted making statements concerning "corruption", "cronyism", and "leadership" within TPD and City administration. Those statements were made while attending a multi-agency training course in his official capacity as a TPD officer and while on duty. In that context, the statements were sufficiently linked to his role as a Department representative to fall within the scope of Policy 1022.4 rather than its protected-speech exception.

The Arbitrator also gives significant weight to the fact that Officer Sheldon, an officer from another jurisdiction with no apparent stake in the matter, took the initiative to report the comments to TPD Sgt. Mohorick. That action is not routine and supports the inference that the

statements were perceived as serious and potentially damaging to TPD's professional reputation.

At the same time, the scope of the violation is limited. Once Officer Fidoe acknowledged making the statements, further investigation into their precise wording was of limited relevance. More importantly, the Record does not establish that the statements resulted in operational disruption, impaired working relationships, or otherwise interfered with the TPD's functioning beyond reputational concerns. While reputational harm is not insignificant—particularly in a law enforcement context—it is not, on this Record, sufficient to elevate this conduct to the level of dischargeable misconduct.

Workplace criticism, even when intemperate or ill-advised, is not inherently incompatible with continued employment. Here, the evidence establishes that Officer Fidoe's conduct crossed the line into a policy violation, particularly given the setting and his role as a TPD representative. However, the conduct is appropriately addressed through discipline short of discharge and does not independently establish just cause for discharge.

The Arbitrator also notes a significant divergence between Officer Fidoe's description of the training-course discussions and the accounts provided by other attendees and documentary evidence in the Record. Officer Fidoe characterized his remarks as consistent with the subject matter of the course and as part of a broader, shared discussion among participants regarding leadership, morale, and corruption in law enforcement. He further described a strong positive reaction from others in attendance, including statements that the instructor endorsed his comments and that members of the class applauded them. See Part II.P.

That account is not corroborated by other evidence in the Record. Officer Sheldon and Officer Hendershott described Officer Fidoe as introducing these topics on his own initiative rather than as part of a structured or anticipated discussion. Officer Hendershott specifically indicated that topics such as corruption and cronyism were not part of the course curriculum and were raised only when Officer Fidoe interjected them into the discussion. The course syllabus likewise does not support Officer Fidoe's characterization of the training content. See Part II.P.

The absence of corroboration for Officer Fidoe's description is notable in several respects. No other witness described the level of agreement or endorsement that Officer Fidoe reported, and no other evidence suggests that his remarks were received in the manner he described. Nor does the documentary evidence support his assertion that the discussion of corruption and cronyism was a central or expected component of the course.

The Arbitrator does not find it necessary to resolve these differences in order to determine whether the statements themselves violated Departmental policy. However, the discrepancies are relevant to the weight afforded to Officer Fidoe's account of events. As discussed more fully in Part V.C, these differences reflect a recurring pattern in which Officer

Fidoe's description of events departs in material ways from other evidence in the Record, particularly where his account portrays his conduct in a more favorable or justified light.

### 5. Alleged Tampering with MDT/AVL Systems

The final asserted basis for discipline concerns the allegation that Officer Fidoe tampered with the MDT/AVL systems in his assigned cruiser. The analysis begins with a summary of the relevant factual record, including the condition of the equipment, the operation of the tracking systems, and the circumstances under which the alleged irregularities were observed.

#### a. Factual Framework

The City's investigation identified instances in which cruiser T11 did not appear on the AVL tracking system during Officer Fidoe's shift, including on dates when he met with Officer Bartulovic outside City limits. See Part II.F. The City's evidence also included testimony that damage was observed to the MDT docking station in cruiser T11 and that removal or manipulation of the MDT could disable AVL tracking. The City also presented testimony that damage to the MDT docking station was consistent with removal or manipulation of the device, and that such conduct could affect AVL functionality. See Part II.F. However, Lt. Donato did not personally inspect the MDT unit, no photographs of the alleged damage were introduced, and no written report from IT personnel documenting the condition of the equipment or the cause of the damage was provided. See Part II.F.

#### b. Arguments of the Parties

OPBA argues that the City failed to establish that Officer Fidoe tampered with the MDT or AVL systems. See OPBA's Post-Hearing Brief at 9-10. OPBA emphasizes that Lt. Donato's conclusions were based on inference rather than direct evidence and that he lacked personal knowledge of any actual damage to the MDT. OPBA further points to the absence of documentation from IT personnel, including photographs or written reports, and argues that the City failed to present reliable technical evidence establishing how any alleged tampering occurred or who was responsible. In OPBA's view, the City's theory rests on speculation and does not meet the applicable burden of proof.

The City argues that the totality of the evidence supports a finding of tampering. See City's Post-Hearing Brief at 8. The City emphasizes that the MDT docking station showed signs of damage consistent with forcible removal, and that removal or manipulation of the MDT can disable AVL tracking. The City further relies on the timing of AVL outages, which occurred on dates when Officer Fidoe met with Officer Bartulovic in locations outside City limits. According

to the City, it is not plausible that the AVL system would coincidentally fail on those occasions absent intentional interference.

**c. Arbitrator's Analysis and Conclusion**

The allegation is a serious one. If proven, it would involve deliberate interference with a system designed to allow dispatch and supervision to monitor an officer's location, with potential implications for officer safety and public safety. Given the gravity of the charge, it requires reliable and persuasive evidence establishing both that tampering occurred and that Officer Fidoe was responsible for it.

The City's evidence, while suggestive, does not meet that standard. The Record establishes that AVL tracking was intermittently inactive on certain dates and that those dates coincide with meetings between Officer Fidoe and Officer Bartulovic. The record also includes testimony that damage was observed to the MDT docking station and that removal of the MDT could affect AVL functionality. However, the evidentiary foundation for these conclusions is limited.

Lt. Donato did not personally inspect the MDT unit. No photographs of the alleged damage were introduced. No written report from IT personnel was provided to document the condition of the equipment, the nature of the damage, or the mechanism by which the damage occurred. The conclusion that the damage resulted from forcible removal, and that such removal was attributable to Officer Fidoe, rests largely on secondhand information and inference rather than direct evidence.

The Arbitrator recognizes that the timing of the AVL outages is suspicious and that the alleged conduct is consistent with the evidence that Officers Fidoe and Bartulovic sought to conduct their meetings in a manner that avoided detection. The Arbitrator also recognizes that Officer Fidoe's credibility has been called into question in other respects. Those factors support an inference of possible misconduct.

Suspicion, however, is not proof. In light of the seriousness of the allegation, the absence of direct evidence or documented technical findings creates a significant evidentiary gap. On this record, the Arbitrator is not persuaded that the City has established that Officer Fidoe intentionally tampered with the MDT or AVL systems.

**C. Credibility of Officer Fidoe**

As discussed in Part II.Q, the Record includes multiple instances in which Officer Fidoe provided testimony at the Arbitration hearing that was demonstrably inaccurate or materially misleading, including testimony contradicted by objective evidence such as video recordings. Those instances arose in connection with matters occurring after the City's discharge decision

and therefore do not constitute independent grounds to sustain the discipline imposed in this case. They are, however, directly relevant to the Arbitrator's assessment of Officer Fidoe's credibility as a witness.

Arbitration frequently requires the resolution of disputed factual issues based on competing testimony. In performing that function, arbitrators often begin with a working assumption that a witness is attempting to testify truthfully, even if that testimony is imperfect or influenced by memory or perspective. On this Record, that assumption cannot be applied to Officer Fidoe without qualification. The pattern reflected in Part II.Q is not limited to isolated inconsistencies or minor lapses in recollection. Rather, it includes multiple statements concerning concrete, verifiable events that were contradicted by objective evidence and were not persuasively explained when those contradictions were brought to light.

The significance of that pattern lies not in the particular subject matter of the post-termination events, but in what it reveals about the reliability of Officer Fidoe's testimony more generally. In several instances, Officer Fidoe adhered to a version of events that was inconsistent with objective evidence until confronted with that evidence, at which point the account shifted. In other instances, Officer Fidoe's descriptions of prior events were framed in a manner that materially overstated or mischaracterized what had occurred. These are not characteristics of testimony that can be credited without careful scrutiny.

Accordingly, where Officer Fidoe's testimony conflicts with objective evidence or with more reliable documentary or testimonial evidence, the Arbitrator assigns little weight to that testimony. Where Officer Fidoe's testimony stands alone and is not corroborated by other evidence, it is evaluated with caution and is not relied upon unless it is independently persuasive. This approach does not presume intentional deception in every instance, but it reflects the Arbitrator's conclusion that the Record demonstrates a pattern of statements that are not consistently grounded in objective fact.

This credibility assessment informs the analysis in Part V.B and the conclusions that follow. It is not an independent basis for discipline, but it necessarily affects the weight assigned to competing evidence in resolving the issues presented in this case.

**D. Overall Just Cause Determination**

The issue at this stage is whether the City has established just cause for discipline based on the sustained charges, considered collectively and in light of the entire Record. That inquiry requires the Arbitrator to evaluate not only each violation individually, but also how those violations interact and bear on Officer Fidoe's overall fitness for continued employment.

As discussed above, the Arbitrator has reached the following conclusions with respect to the City's asserted grounds for discipline. The City established that Officer Fidoe violated TPD

standards by (1) failing to correct an inaccurate and materially misleading account of the events of February 21, 2023, once he had reason to question that account, (2) engaging in a pattern of meetings with Officer Bartulovic during duty hours in a manner inconsistent with the expectations of patrol duty, and (3) making disparaging statements about the Twinsburg Police Department and City administration while attending a multi-agency training course in his official capacity. The City did not establish that Officer Fidoe engaged in insubordination by failing to appear for the February 13, 2024, investigatory interview or that he tampered with MDT or AVL systems.

Taken together, the sustained violations constitute misconduct warranting discipline. The failure to correct a materially inaccurate account during an internal investigation implicates TPD's standards concerning truthfulness and integrity, even absent a finding that the initial statement was intentionally false. The misuse of duty time and the manner in which Officer Fidoe conducted meetings with Officer Bartulovic reflect conduct inconsistent with the expectations of patrol work, particularly the visibility and deterrence functions associated with that role. The disparaging statements made during the training course, while not independently dischargeable, nonetheless violated TPD policy and undermined the professional expectations associated with representing TPD in an official setting.

The Arbitrator has also considered the role of credibility in evaluating the evidence. As discussed in Part V.C, the Record requires that Officer Fidoe's testimony be assessed with caution, particularly where it is inconsistent with objective evidence, and that approach has been applied in resolving the disputed issues addressed above. This credibility determination reinforces the conclusions reached in Part V.B, but it does not independently expand the scope of the violations sustained or convert otherwise non-dischargeable conduct into dischargeable misconduct.

The remaining question is whether these sustained violations, viewed collectively, rise to the level of just cause for discharge or instead establish just cause for discipline short of discharge. That determination requires consideration of the seriousness of the misconduct, the extent to which it implicates core job functions, and the presence of mitigating or aggravating factors. Those considerations are addressed in the section that follows.

**E. Penalty of Discharge**

The final issue is whether discharge was an appropriate penalty for the misconduct established in this case. In resolving that issue, the Arbitrator considers the nature and seriousness of the sustained violations, the extent to which those violations implicate core job functions, and the presence of mitigating and aggravating factors.

The City argues that discharge was necessary because Officer Fidoe's conduct demonstrates a fundamental lack of truthfulness incompatible with continued service as a

police officer. See City's Post-Hearing Brief at 42-44. The City emphasizes that truthfulness is essential to law enforcement duties, including internal investigations and courtroom testimony, and that once an officer's credibility is compromised, TPD cannot reasonably rely on that officer. OPBA, by contrast, argues that the City failed to establish the most serious allegations and that the remaining conduct could have been addressed through progressive discipline. OPBA's Post-Hearing Brief at 37-38.

As discussed in Part V.D, the sustained violations include (1) a failure to correct a materially inaccurate account during an internal investigation, (2) misuse of duty time in connection with meetings with Officer Bartulovic, and (3) disparaging statements made in an official setting. Standing alone, none of these violations would necessarily warrant discharge. The question is whether their cumulative effect, viewed in context, justifies that penalty.

At the time the City made the discharge decision, the Record already contained substantial grounds for concern regarding Officer Fidoe's reliability in an official setting. During the February 13, 2024, investigatory interview, Officer Fidoe provided an account of the events of February 21, 2023, that was materially inconsistent with objective evidence. Even if the initial inaccuracy is viewed as a mistake, the City was entitled to expect that Officer Fidoe would revisit and correct that account once confronted with contrary evidence. The failure to do so reasonably undermined the City's confidence in his ability to provide accurate and complete information.

That concern was not limited to a single statement. From the City's perspective, Officer Fidoe maintained a version of events that conflicted with objective data until the discrepancy became untenable. In a law enforcement context, where officers are required to document events accurately and testify reliably, the City could reasonably conclude that this pattern raised a serious question about Officer Fidoe's fitness to perform essential job functions.

The City's concern about its ability to trust Officer Fidoe was further enhanced by discrepancies between Officer Fidoe's description of other events and the accounts provided by independent witnesses and documentary evidence. For example, Officer Fidoe characterized his remarks during the training course as consistent with the course curriculum and widely supported by other attendees, including the instructor. The Record, including witness accounts and the course syllabus, does not support that characterization. See Parts II.P and V.B.4.c. From the City's perspective, this type of discrepancy reasonably suggested that Officer Fidoe's accounts of events could not be accepted at face value where objective or corroborating evidence pointed in a different direction.

The post-termination evidence described in Part II.P is not relied upon as an independent basis to sustain the discharge decision, as it was not known to the City at the time. However, that evidence is relevant in assessing whether the City's loss of confidence was reasonable. In particular, Officer Fidoe's description of the July 25, 2025, incident—both at the Arbitration hearing and in his contemporaneous appeal of his termination from Springfield

Township—materially mischaracterized events that were captured on video and occurred only weeks earlier. See Part II.P. Officer Fidoe not only maintained that characterization but relied on it to challenge the judgment and professionalism of Chief Simone. These circumstances significantly reduce the likelihood that the discrepancies reflected ordinary lapses in memory and instead reinforce Officer Fidoe's pattern, described in Part V.C, of asserting as fact versions of events that conform more to his self image than they do to objective reality. In that sense, the post-termination evidence confirms—rather than creates—the conclusion that the City could not reasonably rely on Officer Fidoe's representations in matters where accuracy is essential.

The Arbitrator has also considered mitigating factors. The Record does not reflect a significant prior disciplinary history within the relevant period. In addition, the misuse of duty time and the training-course statements, viewed in isolation, are the types of conduct that might ordinarily be addressed through progressive discipline. These considerations weigh against discharge when those violations are considered separately.

On this Record, the Arbitrator finds that the City's loss of confidence in Officer Fidoe's credibility was reasonable at the time of discharge. That conclusion is grounded in Officer Fidoe's failure to correct a materially inaccurate account during an internal investigation and in additional discrepancies that reasonably called into question the reliability of his descriptions of events, including his characterization of the training-course discussions. The subsequent evidence discussed above reinforces that conclusion by demonstrating a consistent pattern in which Officer Fidoe's accounts diverge from objective or corroborated evidence, particularly where his accounts portray his conduct in a more favorable light. In a law enforcement setting, where the ability to perceive, report, and testify accurately is fundamental, that pattern supports the City's determination that it could not reasonably rely on Officer Fidoe to perform essential job functions.

## VI. Disposition

The Grievance in this matter challenged the discharge of Officer Fidoe. For the reasons set forth above, the Arbitrator has concluded that the City had just cause to discharge Officer Fidoe. Accordingly, the Grievance is denied.

Consistent with Article 41, Section 4, the OPBA, as the party that did not prevail in the grievance, shall bear the fees and expenses of the Arbitrator, as well as the cost of the hearing room, if any.

____________________________________

Richard A. Bales, Arbitrator